UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LIBERTY MUTUAL PERSONAL INSURANCE COMPANY; LM GENERAL INSURANCE COMPANY; AMERICAN ECONOMY INSURANCE COMPANY; and SAFECO INSURANCE COMPANY OF ILLINOIS, | C.A. No. _____ |
| Plaintiffs, | **Demand for Jury Trial** |
| v. | |
| ACCURATE CARE, L.L.C.; NOVAMED L.L.C.; COMPLETE FITNESS & RHB, LLC; NERVEANA, LLC; NON OPIOID RELIEF LLC; TRANSCARE DETROIT INC; and ALLAN SCHWARTZ, D.O., | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Liberty Mutual Personal Insurance Company, LM General Insurance Company, American Economy Insurance Company, and Safeco Insurance Company of Illinois (collectively, "Liberty Mutual" and/or "plaintiffs") hereby allege as follows.

## I.   <u>INTRODUCTION</u>

1.     This is a case about medical and physical therapy clinics, durable medical equipment suppliers, a transportation company, and their owners, managers,

agents, and representatives who abused the medical benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Liberty Mutual by submitting false and fraudulent records, bills, and invoices through interstate wires and the U.S. Mail seeking to collect payment from Liberty Mutual for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to applicable statutes and regulations, including the Michigan No-Fault Act.

2.     The insurance fraud scheme perpetrated by defendants Accurate Care, L.L.C. ("Accurate Care"), Novamed L.L.C. ("Novamed"), Complete Fitness & RHB, LLC ("Complete Fitness"), Nerveana, LLC ("Nerveana"), Non Opioid Relief LLC ("Non Opioid Relief"), Transcare Detroit Inc ("Transcare"), and Allan Schwartz, D.O. ("Schwartz") (collectively, the "defendants") was designed to, and did in fact, result in payments from Liberty Mutual to and on behalf of the defendants pursuant to Michigan's No-Fault Act to which the defendants were not entitled under state and federal law.

3.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

4.     By this Complaint, and as detailed in each count set out below, Liberty Mutual brings this action for: (1) violations of the federal Racketeer Influenced and

Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.  Liberty Mutual also seeks declaratory relief that no previously-denied and pending insurance claims submitted to it by the defendants are compensable.

5.      As a result of the defendants' wrongful acts, Liberty Mutual has paid hundreds of thousands of dollars to them related to the patients at issue in this Complaint.

## II.    THE PARTIES

### A.    PLAINTIFFS

6.      Liberty Mutual Personal Insurance Company is a corporation duly organized and existing under the laws of the State of New Hampshire, with its principal place of business in Boston, Massachusetts.

7.      LM General Insurance Company and Safeco Insurance Company of Illinois are corporations duly organized and existing under the laws of the State of Illinois, with their principal places of business in Boston, Massachusetts.

8.      American Economy Insurance Company is a corporation duly organized and existing under the laws of the State of Indiana, with its principal place of business in Boston, Massachusetts.

9.      At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

**B.** **DEFENDANTS**

    **1.** **Accurate Care, L.L.C.**

10.    Defendant Accurate Care, L.L.C. is a limited liability company organized under the laws of the State of Michigan.

11.    Accurate Care's member is defendant Schwartz, who is a citizen of the State of Michigan.

12.    At all relevant times, Accurate Care was operated and conducted by defendants Complete Fitness, Nerveana, Non Opioid Relief, Transcare, and Schwartz.

13.    Accurate Care billed Liberty Mutual for services that were not rendered and for treatment that was unlawful and medically unnecessary and that was billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 1.

    **2.** **Novamed L.L.C.**

14.    Defendant Novamed L.L.C. is a limited liability company organized under the laws of the State of Michigan.

15.    Novamed's member is defendant Schwartz, who is a citizen of the State of Michigan.

16.    At all relevant times, Novamed was operated and conducted by defendants Complete Fitness, Nerveana, Non Opioid Relief, Transcare, and Schwartz.

17.    Novamed billed Liberty Mutual for services that were not rendered and for treatment that was unlawful and medically unnecessary and that was billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 2.

### 3.    Complete Fitness & RHB, LLC

18.    Defendant Complete Fitness & RHB, LLC is a limited liability company organized under the laws of the State of Michigan.

19.    Complete Fitness's member is Youssef Bakri ("Bakri"), who is a citizen of the State of Michigan.

20.    At all relevant times, Complete Fitness was operated and conducted by defendants Accurate Care, Novamed, Transcare, and Schwartz.

21.    Complete Fitness billed Liberty Mutual for services that were not rendered and for services that were unlawful and medically unnecessary and that were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 3.

### 4. **Nerveana, LLC**

22.     Defendant Nerveana, LLC is a limited liability company organized under the laws of the State of Michigan.

23.     Upon information and belief, Nerveana's member is Khalil Moussa, who is a citizen of the State of Michigan.

24.     At all relevant times, Nerveana was operated and conducted by defendants Accurate Care, Novamed, and Schwartz.

25.     Nerveana billed Liberty Mutual for durable medical equipment ("DME") and medical supplies that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to patients at issue herein, including the patients set out in Exhibit 4.

### 5. **Non Opioid Relief LLC**

26.     Defendant Non Opioid Relief LLC is a limited liability company organized under the laws of the State of Michigan.

27.     Upon information and belief, Non Opioid Relief's member is Hussein Nasser, who is a citizen of the State of Michigan.

28.     At all relevant times, Non Opioid Relief was operated and conducted by defendants Accurate Care, Novamed, and Schwartz.

29.     Non Opioid Relief billed Liberty Mutual for DME and medical supplies that were medically unnecessary (to the extent they were rendered at all) and were

unlawful in relation to several patients at issue herein, including the patients set out in Exhibit 5.

### 6.    **Transcare Detroit Inc**

30.    Defendant Transcare Detroit Inc is incorporated under the laws of the State of Michigan.

31.    Transcare's principal place of business is located in Southfield, Michigan.

32.    At all relevant times, Transcare was operated and conducted by defendants Accurate Care, Novamed, Complete Fitness, and Schwartz.

33.    Transcare billed Liberty Mutual for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several patients at issue herein, including the patients set out in Exhibit 6.

### 7.    **Allan Schwartz, D.O.**

34.    Defendant Schwartz is a resident and citizen of the State of Michigan.

35.    At all relevant times, Schwartz owned, operated, and controlled defendants Accurate Care, Novamed, Complete Fitness, Nerveana, Non Opioid Relief, and Transcare.

### III.   JURISDICTION AND VENUE

36.   Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq*., because they arise under the laws of the United States.

37.   Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

38.   Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

39.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

### IV.   BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

40.   The RICO enterprises identified herein – Accurate Care, Novamed, Complete Fitness, Nerveana, Non Opioid Relief, and Transcare (collectively, the "enterprise defendants") – were organized to take advantage of the benefits available under Michigan's No-Fault law.

41.   The defendants used the RICO enterprises to submit exorbitant charges to Liberty Mutual for purported medical services, procedures, DME, and testing that

were not actually provided, were not medically necessary, and were fraudulently billed.

42.    The purpose of the scheme was to generate the highest possible amount of charges to Liberty Mutual through abuse of the Michigan No-Fault Act, which provides for the payment of medical and rehabilitative benefits on a first-party payor basis for individuals injured in motor vehicle accidents.  Mich. Comp. Laws § 500.3107(1)(a).

43.    The enterprise defendants are interrelated and share ownership and management in a manner that created an incentive for the defendants to cooperate in the implementation of the wrongful scheme described herein to generate bills for submission to Liberty Mutual.

44.    The scheme described herein was driven by Schwartz and his layperson associates who own and operate the enterprise defendants and have a lengthy history of fraudulent behavior.

45.    For example, in 2022, Bakri, the owner of defendant Complete Fitness, pleaded guilty to conspiracy to defraud the United States and knowingly paying and receiving kickbacks for referrals of patients in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320A-7(b)(2)(A).  *See* United States of America v. Youssef Bakri, 21-cr-20484, ECF No. 23 (E.D. Mich. 2022).

46.     Defendant Transcare's owner, Hala Moussa, has a history of operating providers that submit fraudulent billing under the No-Fault Act, and both she and another non-emergency medical transportation company she owned and that operated similarly to Transcare were sued previously by auto insurers in Michigan for fraudulent conduct similar to the scheme described herein that also involved medical providers owned, controlled, and operated by Bakri and Schwartz.

47.     Schwartz also has a history of involvement in fraudulent billing schemes under the No-Fault Act, as he worked as a physician in other medical practices that have been sued by Liberty Mutual and other insurers for fraud, including a clinic called Multicare Health Center LLC ("Multicare").

48.     Accurate Care currently operates from the addresses of what was previously Multicare and from the former address of another medical clinic, Vital Community Care, P.C. ("Vital"), that has also engaged in a fraudulent scheme similar to the one described herein.

49.     Similarly, Complete Fitness operates from the address previously used by another physical therapy clinic, Ferndale Rehabilitation Center, that also has engaged in fraudulent No-Fault Act billing, and Complete Fitness continued many of the same practices used by Ferndale Rehabilitation Center and assumed treatment of patients who previously received alleged treatment at Ferndale Rehabilitation Center.

50.   As detailed herein, Accurate Care and Novamed have continued many of the same fraudulent practices engaged in by Multicare and Vital, utilize many of the same medical forms, and implement many of the same fraudulent practices that were used by Multicare and Vital.

51.   Indeed, defendant Accurate Care has submitted records to Liberty Mutual purporting to be its own that use Vital's name and letterhead, including an MRI order relative to B.G. (Claim No. 050167028)[1] on November 18, 2022.

52.   Moreover, many of the providers at Accurate Care and Novamed, including Schwartz, Namir Zukkoor, M.D., Casey Darrah, M.D., and Gargiben Patel, N.P., previously billed for the same or similar services at Vital and other clinics that have been sued for fraudulent No-Fault Act billing in the past.

53.   In order to implement their fraudulent scheme, the defendants or layperson associates acting on their behalf solicited auto accident victims to report to Accurate Care or Novamed for treatment that they would not otherwise have sought.

54.   Once patients reported to Accurate Care and Novamed, the defendants implemented a predetermined treatment protocol that included unsupported

---

[1] To protect the confidentiality of the patients at issue herein, Liberty Mutual refers to them by initials and Liberty Mutual claim number. The defendants are aware of the Liberty Mutual claim number, as the defendants included the claim number on the bills they submitted to Liberty Mutual.

disability findings as well as automatic prescriptions, referrals, and orders for unnecessary and excessive medical services and equipment that were billed by each of the other enterprise defendants.

55.     The defendants' predetermined treatment protocol used non-specific diagnoses of injuries made by Accurate Care and Novamed, such as neck and back "sprains" and "strains," to create the appearance of injury and to order medically unsupported and unnecessary testing, such as electrodiagnostic testing, electroencephalograms ("EEGs"), and x-rays that were fraudulently billed to Liberty Mutual by Accurate Care and Novamed as described below.

56.     Defendants Accurate Care's and Novamed's vague, unsupported, and false diagnoses of injury and their automatic disability findings also were used to order equipment and services billed by their co-defendants, including DME ordered from and billed by defendants Nerveana and Non Opioid Relief and nonemergency medical transportation billed by defendant Transcare.

57.     Accurate Care and Novamed also used their vague and unsupported diagnoses to prescribe lengthy and excessive courses of physical therapy billed by defendant Complete Fitness, including billing for experimental and medically unnecessary services such as purported trigger point impedance imaging ("TPII") and localized intense neurostimulation therapy ("LINT") using a machine called a

Nervomatrix that was always medically unnecessary and has been determined by Michigan courts to be non-compensable under the No-Fault Act.

58.     The close relationship between the defendants and their reliance on automatic referrals and orders between each other to carry out their scheme is demonstrated, in part, by the fact that two-thirds of all Liberty Mutual insureds with respect to whom Complete Fitness billed Liberty Mutual during the period at issue in this action also were patients of Accurate Care or Novamed.

59.     Similarly, 80% of Non Opioid Relief patients, 76% of Transcare patients, and more than 55% of Nerveana patients for whom each of these entities billed Liberty Mutual during the same period were also patients of Accurate Care or Novamed.

60.     Most of the defendant enterprises – including at least Accurate Care, Novamed, Complete Fitness, Nerveana, and Transcare – faxed bills to Liberty Mutual using the same number of (313) 242-0689.

61.     Several physicians, including a neurosurgeon named Syed Tajuddin, M.D. ("Tajuddin"), purported to evaluate patients at both Accurate Care and Novamed.

62.     Some patients, including C.A. (Claim No. 048211578), were alternated for purported evaluations between Accurate Care and Novamed.

63.    The defendants' predetermined course of treatment, described in detail below, was designed to generate referrals to, and therefore billing from, each of the defendant enterprises.

64.    At each patient visit, Accurate Care and Novamed (hereinafter referred to as "the defendant clinics") recommended the same course of treatment that would result in billing by the other defendant enterprises without evaluating prior treatment, including failing to evaluate whether previous treatments such as physical therapy were helpful and whether the DME being prescribed was beneficial or effective.

65.    The defendants' practices, detailed further below, of ordering the same treatment and DME using the same copied and pasted evaluations and reports for almost every patient regardless of age, physical condition, and comorbidities demonstrates that the defendants' services were not medically necessary, were fraudulent, and were designed and implemented solely to generate billing under the No-Fault Act.

## V.    **BILLING FOR SERVICES NOT RENDERED**

66.    The defendants regularly submitted bills to Liberty Mutual seeking payment for treatment and services that were never rendered to patients at issue herein.

67.    The defendants' pervasive conduct of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as

many bills for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

68.     All of the bills submitted by the defendants to Liberty Mutual through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

69.     Liberty Mutual is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

### A.     THE DEFENDANTS BILLED FOR DME AND RELATED SERVICES NOT PROVIDED

70.     Non Opioid Relief and Nerveana each billed Liberty Mutual for DME and related services that were not actually supplied to patients.

71.     One way the defendants did this was by adding charges for self-management education and training using Current Procedural Terminology ("CPT") code[2] 98960 whenever they billed for DME items.

---

[2] CPT codes are published by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.  Providers subject to the Health Insurance Portability and Accountability Act are required to use CPT codes when submitting bills.

72.    In order to bill for self-management education and training, a physician must actually prescribe the service and the service must be fulfilled by a different and qualified practitioner other than the prescribing physician.

73.    When it was billed by Non Opioid Relief and Nerveana, self management education and training was never actually ordered by a physician and so was not billable even if some form of instruction may have been provided.

74.    Moreover, in many instances, DME items billed by the defendants and for which they also billed for self management education and training, such as cervical pillows, heating pads, and back braces, were actually provided to patients at the defendant medical clinics, meaning that if any instruction was offered it was not provided by Non Opioid Relief or Nerveana.

75.    For example, A.A. (Claim No. 054596303) testified in November 2023 that the only DME she had been given were braces that she received the previous month.

76.    Defendant Non Opioid Relief billed for allegedly issuing two (2) separate infrared heating pads for a total charge of more than $14,000 on September 24, 2024.

77.    Even assuming *arguendo* that these heating pads (that are not braces and were not given to the patient in October 2023) were given to the patient at all,

Non Opioid Relief billed for services not actually provided by including two (2) separate charges for providing instruction and education on the use of the braces.

78.    Not only would it be improper and unnecessary to bill twice for explaining how to use the same device just because two (2) devices were unnecessarily issued, A.A. explained in her testimony that no education and training was actually provided because the DME came with written instructions instead.

79.    As another example, at her initial evaluation on November 15, 2023, Accurate Care prescribed a cervical pillow, heating pad, and back brace for T.H. (Claim No. 055238393), which Nerveana billed for supplying on the same date.

80.    Nerveana also billed $400 for self management education and training that, in addition to being unnecessary, did not actually occur because the items of DME were provided to T.H. by Accurate Care at her appointment.

81.    Nerveana also billed $350 for delivery and set-up of the DME for T.H., which again did not occur since it did not actually deliver the DME itself.

82.    Similarly, Nerveana billed for allegedly issuing numerous items of DME to A.A. (Claim No. 054596303) on December 28, 2023 and included charges for education and training and for delivery and set-up.

83.    Neither of these services were provided at all by Nerveana as the DME, if given to A.A. at all, was handed to her in the office of Novamed, which separately reported that it gave the DME to A.A. on that date.

84.    Every time Nerveana and Non Opioid Relief billed for self management, education, and training that was not ordered by a physician and not provided by a representative of Nerveana and Non Opioid Relief or when they billed for delivery and set up of DME that they did not actually provide, these defendants billed for services that were not rendered.

### B.    ACCURATE CARE BILLED FOR X-RAYS NOT PERFORMED

85.    Accurate Care routinely billed Liberty Mutual for x-rays of the cervical and lumbar spine using CPT code 72040 ("radiologic examination, spine, cervical; two or three views") and CPT code 72100 ("radiological examination, spine, lumbrosacral; two or three views"), respectively.

86.    In order to bill using CPT codes 72040 and 72100, a medical provider is required to obtain two or three views of the relevant spinal segment.

87.    Accurate Care routinely failed to identify what views were taken or the number of views taken, indicating that only a single view was taken even though Accurate Care billed using multiple view CPT codes (which are billed at a higher rate).

88.    When Accurate Care actually did obtain multiple images, as it did when taking x-rays of a patient's shoulder, for example, it noted the number of images obtained, further evidencing that just a single view was taken during spinal x-rays.

89.    As one example, on October 27, 2023, Accurate Care billed for an initial examination of patient L.P. (Claim No. 055149340) and, despite diagnosing L.P. with only headaches and sprains, ordered x-rays of the cervical spine, lumbar spine, and bilateral shoulders that were billed on the same date.

90.    For the cervical spine x-ray, Accurate Care billed CPT code 72040, indicating that two or more separate images were obtained, but its report does not identify the number of images obtained and does not refer to or evaluate multiple images, demonstrating that, at most, only a single cervical spine x-ray was taken.

91.    Similarly, Accurate Care billed CPT code 72100 with respect to its purported lumbar x-ray but its report analyzing the lumbar x-ray does not identify how many x-rays were taken and, like the cervical x-ray report, does not reference or review more than one view.

92.    In contrast, Accurate Care's reports for the left and right shoulder x-rays that L.P. allegedly received on that same date each expressly state that two views were obtained, demonstrating that when more than one x-ray was taken, Accurate Care's reports noted such.

93.    Billing using CPT codes 72040 and 72100 without obtaining and documenting multiple views constitutes billing for services that were not actually rendered.

94.    Accurate Care billed using these CPT codes describing services that were not actually provided because it could bill a higher amount for the services than it could bill using the CPT codes for the single image x-rays that it obtained, if any x-rays actually occurred at all.

### C.    COMPLETE FITNESS BILLED FOR PHYSICAL THERAPY NOT PERFORMED

95.    Complete Fitness routinely billed Liberty Mutual for physical therapy services that were not provided, including for purported neuromuscular reeducation that did not actually occur.

96.    Neuromuscular reeducation is a physical therapy treatment that is intended to be used for improving balance and coordination of the lower extremities, typically used when there are central nervous system dysfunctions after a stroke.

97.    Neuromuscular reeducation is typically not appropriate for patients with minor orthopedic injuries (as opposed to nervous system injuries), particularly upper extremity injuries, yet Complete Fitness routinely billed for purported neuromuscular reeducation for patients without any lower extremity injuries or limitations.

98.    Even when patients reported pain in their lower extremities, Complete Fitness never documented nervous system injuries requiring neuromuscular reeducation and its treatment records never documented providing such services despite billing for doing so.

99.    As one example, on November 30, 2022, Complete Fitness billed for neuromuscular reeducation with respect to patient B.J. (Claim No. 048802630).

100.   B.J.'s only complaint was of "mild low back pain" rated just a two (2) or three (3) out of ten (10) on the pain scale, and Complete Fitness reported only that B.J. performed a number of therapeutic exercises and activities for thirty-five (35) minutes and received electrical stimulation and manual therapy, but described no neuromuscular reeducation services because they did not occur.

101.   As another example, Complete Fitness repeatedly billed for alleged neuromuscular reeducation that did not occur with respect to patient C.W. (Claim No. 055679870).

102.   As in the representative example below from March 18, 2024, each time Complete Fitness billed for neuromuscular reeducation to C.W., it included the same copied and pasted language under the heading "THERAPEUTIC EXERCISES, ACTIVITY, & NMES" describing exactly the same exercises performed the same number of times for the same number of minutes, none of which constitute neuromuscular reeducation:

**Objective:** THERAPEUTIC EXERCISES, ACTIVITY, & NMES X 30 MIN

CERVICAL: FLEXION, EXTENSION, ROTATION, RETRACTION, SIDEBEND, CHIN TUGS, SHOULDER SHRUGS, & SHOULDER BRACING 10 X 2. NECK STRETCHES 2 X 2.

SHOULDER: FLEXION, EXTENSION, ABDUCTION, HORIZONTAL ABDUCTION/ADDUCTION, ROLLS, SCAPULA RETRACTION, INTERNAL/EXTERNAL ROTATION, SHRUGS, & PENDULUM EXERCISES 10 X 2,

LUMBAR: PPT, SUPINE SLR, BRIDGING, LTR, SKTC, & PRONE HEAD AND CHEST EXTENSION WITH FOREARM SUPPORT 10 REPS X 2 SITTING BACK STRETCHES WITH BALL IN 3 DIRECTION 10 X 2.

STATIONARY BIKE/ THREADMILL X 15 MIN

103.   Moreover, Complete Fitness also billed for one unit of therapeutic exercise and one unit of therapeutic activity using the timed CPT codes 97110 and 97530, for C.W.'s alleged physical therapy session on March 18, 2024.

104.   Like many of the alleged services billed by Complete Fitness (including neuromuscular reeducation), CPT codes 97110 and 97530 are timed services that require skilled and direct one-on-one attention from a qualified therapist in order to properly bill.

105.   Each unit billed for a timed code represents fifteen (15) minutes of treatment, of which at least eight (8) minutes must be actually performed in order to submit a bill for that timed code.

106.   For example, one (1) unit of a timed-based code may be billed for treatment lasting between eight (8) and twenty-two (22) minutes (assuming all other requirements are met, including that treatment was done with constant supervision and on a one-on-one basis) and a second unit may be billed only after twenty-three

(23) minutes of purported treatment is completed and so forth as illustrated by the chart below:

| Units | Minutes of Treatment |
|-------|----------------------|
| 1 | 8 - 22 |
| 2 | 23 - 37 |
| 3 | 38 - 52 |
| 4 | 53 - 67 |
| 5 | 68 - 82 |

107.   By billing for one unit each of CPT codes 97110 and 97530 with respect to C.W., Complete Fitness represented that it had provided these services to C.W. for at least twenty-three (23) minutes meaning that, since Complete Fitness's own notes indicate that these exercises and activities took only a total of thirty (30) minutes to perform, it did not render and could not properly bill for a third unit of a timed service, including the neuromuscular reeducation that it billed using CPT code 97112.

108.   Complete Fitness reported that fifteen (15) minutes of the thirty (30) minutes that C.W. allegedly spent performing exercises was spent using a stationary bike or treadmill, which are not exercises that require skilled, one-on-one attention from a qualified therapist and therefore may not be billed using CPT codes 97110 or 97530.

109.   As another example, on November 30, 2022, Complete Fitness billed for both neuromuscular reeducation and also billed for three (3) units of therapeutic exercise and activities using CPT codes 97110 and 97530 with respect to patient B.J.

110.   Complete Fitness claimed that B.J. received only thirty-five (35) minutes of alleged treatment on November 30, 2022, so could at most properly bill for just two (2) units of timed services, meaning that one (1) unit of the therapeutic exercises and the neuromuscular reeducation billed by Complete Fitness were not actually rendered.

111.   Complete Fitness billed for neuromuscular reeducation and therapeutic exercise that did not occur in the same manner with respect to patient B.J. on at least eighteen (18) separate dates.

112.   All of the bills submitted by Complete Fitness to Liberty Mutual seeking payment for physical therapy services that were not actually rendered to patients are fraudulent.

113.   Liberty Mutual is not required to pay the defendants for physical therapy that was never rendered to the patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

**D.   BILLING FOR ELECTRODIAGNOSTIC TESTING NOT PERFORMED**

114.   One of the only purported services that was billed by Accurate Care and Novamed rather than by the associated clinics to which they made referrals was alleged electrodiagnostic testing, including purported electromyographies ("EMGs") and nerve conduction studies ("NCS").

115.   As detailed below, the defendants abused and misused these types of tests, including billing for such testing without any medical support and using a predetermined protocol to bill for far more tests than could possibly have been necessary or appropriate.

116.   The defendants also billed for electrodiagnostic testing they did not perform at all as a matter of routine practice.

117.   When Accurate Care and Novamed claimed to perform EMGs, they billed for such alleged tests using CPT code 95886 and reported that they performed four (4) units at a time.

118.   CPT code 95886 describes performing an EMG test to each extremity (and performing the most extensive testing possible to each extremity), so billing four (4) codes at once is a representation that every patient extremity was tested.

119.   In reality, the defendants only tested (if at all) the upper or lower extremities during each visit, so they routinely billed for testing at least two (2) extremities that were not tested at all.

120.   For example, on March 18, 2024, Novamed billed for allegedly performing extensive EMG tests on all four (4) extremities of C.A. (Claim No. 048211578) when at most it only tested C.A.'s lower extremities.

121. Similarly, on June 7, 2024, Accurate Care billed for allegedly performing extensive EMG tests on all four (4) extremities of E.H. (Claim No. 056038987) when at most it only tested E.H.'s upper extremities.

122. For both C.A. and E.H., Novamed and Accurate Care claimed to perform at least thirteen (13) separate NCS tests.

123. In reality, they performed at most seven (7) NCS relative to C.A. and six (6) relative to E.H., meaning approximately half of the tests billed were not performed at all.

124. As with the other categories of billing for services not rendered addressed herein, these examples were done as part of routine practices by both Accurate Care and Novamed and were repeated with respect to numerous patients.

### E.   BILLING FOR VESTIBULAR TESTING NOT PERFORMED

125. The other category of testing routinely billed by Accurate Care and Novamed was purported vestibular testing, which these defendants ordered and billed in response to supposed claims of headaches that they always characterized as closed head injuries even when the evidence suggested that if the pain existed at all, that it was referred from other body parts such as the neck and shoulder.

126. Vestibular testing was allegedly done by a physician named Tessy Jenkins, M.D. using an automated software program called eVox, and the defendants

billed a total of $4,875 using five (5) separate CPT codes every time this testing was allegedly performed.

127.   At least three (3) of the separately billed CPT codes used by the defendants for these tests were for services not actually done.

128.   One such code – CPT code 95816 – describes performing an EEG for at least twenty (20) to forty (40) minutes with the patient in both a state of alertness and a state of drowsiness.

129.   This type of EEG test is used to evaluate and diagnose patients who have seizures or similar serious neurologic problems, not purported headaches from minor accidents.

130.   Legitimate providers who use this type of EEG test provide directions to patients so that they are actually drowsy for such testing, including altering their sleep habits in advance.

131.   The defendants provided no such instructions, and instead appear to have billed for this service simply because the eVox software records findings with patients' eyes open and closed.

132.   Further, the defendants did not test patients for nearly the time required to bill for this type of EEG test, as the records generated by the eVox software document just one (1) minute of EEG data for open and closed.

133.   Another CPT code used by the defendants for purported vestibular testing is 95957, which describes analysis of the results of an EEG test but is expressly prohibited from being used when the results are analyzed using automated software.

134.   As discussed above, the eVox software used by the defendants provides exactly the type of automated analysis that is not billable and therefore claims to Liberty Mutual using CPT code 95957 also constitute a service not actually performed.

135.   The defendants' suite of charges for alleged vestibular testing also includes CPT code 92651, which describes a test for auditory evoked potentials.

136.   None of the pages of automated and redundant supposed findings generated by the eVox software include any type of hearing test, so this is yet another component of purported vestibular testing not performed.

137.   These three (3) tests out of the five (5) billed were not performed for any patient for whom the defendants submitted charges for alleged vestibular testing.

## F.   COMPLETE FITNESS BILLED FOR TPII AND LINT THAT DID NOT OCCUR

138.   In conjunction with its billing for extensive physical therapy that did not occur as discussed above, Complete Fitness also billed for TPII and LINT that was not performed.

139.   As one example, Complete Fitness billed Liberty Mutual for three (3) purported sessions of TPII and LINT with respect to patient C.W. (Claim No. 055679870) between January 17, 2024 and March 7, 2024.

140.   That the TPII and LINT billed with respect to C.W. did not occur is evidenced by the fact that Complete Fitness never included a report for the alleged TPII and LINT and by the fact that the daily treatment notes for C.W.'s alleged physical therapy on each date that TPII and LINT was billed make no reference to such treatment occurring, but instead include only the same basic language describing C.W.'s treatment on each date:

> **Treatment:**  MHP X 15 MIN
>
> ULTRASOUND – 8 MIN, MLS THERAPY X MIN TO LT SHOULDER
>
> ELECTRICAL STIMULATION X MIN
>
> THERAPEUTIC MASSAGE X 15 MIN
>
> **Assessment:**  PATIENT TOLERATED WELL WITH THERAPY.
>
> **Plan:**  CONT PT PER POC

141.   As further evidence that this treatment did not occur, Accurate Care billed for re-evaluations of C.W. in February 2024 and on March 14, 2024, both of which were in the middle of C.W.'s alleged TPII/LINT treatment at Complete Fitness, and on both dates made no mention of the purported TPII/LINT treatment.

## VI.   <u>UNLAWFUL SOLICITATION BY THE DEFENDANTS</u>

142.   The solicitation and exploitation of motor vehicle accident victims for profit or professional gain is strictly prohibited in the State of Michigan, as is the use of factors other than legitimate medical judgment to bill insurers like Liberty Mutual.

143.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

144.   Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

145.   It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, and to use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503(1)(a).

146.   Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157(1).

147.   As set forth more fully below, the defendants participated in and willingly benefited from schemes to solicit patients through conduct prohibited under Michigan law.

148.   Despite Michigan's prohibition on patient solicitation, the defendants employed unlawful and improper methods to obtain patients, including the solicitation of auto accident victims to report to Accurate Care and Complete Fitness.

149.   As one example of this type of illegal solicitation by the defendants, Liberty Mutual insured B.H. (Claim No. 054894690) reported to Liberty Mutual that after her auto accident she received two phone calls from defendant Schwartz's office and Accurate Care seeking to set up appointments for her and offering transportation assistance.

150.   B.H. expressed concern to Liberty Mutual for why and how the defendants had information about her.

151.   Patients have also confirmed that they were directed to the defendants by their attorneys for medical services after their alleged auto accidents.

152.   For example, patient T.H. (Claim No. 055238393) stated during an independent medical examination that after her primary care doctor determined that she did not require treatment as a result of her claimed auto accident, her attorney directed her to Accurate Care, which immediately implemented a predetermined treatment protocol designed to quickly generate charges, including by ordering multiple items of DME from defendant Nerveana and physical therapy billed by Complete Fitness that continued for almost four (4) months.

153.   The unlawful solicitation and unqualified referral of patients to the defendants by laypersons was an improper non-medical factor that directly led to the unnecessary and otherwise fraudulent bills submitted to Liberty Mutual detailed herein.

154.   The referral of alleged accident victims to the defendant enterprises bore no relation to the medical necessity of the patients at issue in this Complaint, who would not have sought treatment but for the unlawful solicitation and referrals.

155.   The defendants enabled and participated in this system of solicitation and referrals in order to obtain patients on whom they could impose their predetermined treatment protocol as described herein in order to bill for excessive and medically unnecessary treatment designed to maximize the charges billed to Liberty Mutual under the No-Fault Act.

156.   Accordingly, the defendants' treatment of the solicited patients constituted unlawful, unreasonable, and unnecessary services and wrongful conduct that are not payable under the No-Fault Act.

## VII.   FALSIFIED MEDICAL RECORDS

157.   The defendants created and submitted medical records that were copied, forged, and fabricated in an effort to conceal their fraud and to create the appearance of significant injury in order to justify their bills.

158.   The forged, altered, and falsified documents created by the defendants were submitted to deceive Liberty Mutual into paying for treatment and services that were illegal, medically unnecessary, or not rendered at all.

159.   Most egregiously, the defendants routinely generated purported orders for outrageously billed and completely unnecessary experimental procedures such as laser therapy that were on copied-and-pasted forms with defendant Schwartz's signature already on the template to create the appearance that a medical doctor had made or approved such orders.

160.   For example, Novamed billed $5,900 on each of April 23, 2024, July 18, 2024, and August 21, 2024 for purported laser therapy treatments to C.A. (Claim No. 048211578) and on each occasion the alleged referral form contained a copied-and-pasted signature of Schwartz:

161.   As illustrated above, the purported signature of Schwartz is exactly the same, including intersecting with the pre-printed portions of the form in a way that could not have been replicated either with a signature or a stamp.

162.   Similarly, on all three (3) of these dates, a form called "patient registration" – which the defendants also appear to have submitted as the sole record of these nearly $6,000 procedures – also contains copied-and-pasted signatures of Schwartz:

163.   This form was only purportedly signed by Schwartz and did not contain alleged signatures of nurse practitioners or any other providers, so there was no physician who actually signed the record purporting to document that this ridiculous claimed treatment was rendered.

164.   Schwartz's signatures were also copied-and-pasted onto the disability certificates that the defendant clinics routinely issued to allow other defendants such as Transcare to bill, as in the following examples also submitted with respect to C.A.:



165.   These pre-signed and copied disability certificates were also used for other patients, as evidenced by the following disability certificate allegedly issued to R.M. (Claim No. 050482524) that it is now apparent was not actually reviewed by a doctor at all:

166.   The defendants also generated records to create the appearance that they made orders or performed services that were not done at all.

167.   For example, defendant Novamed created a prescription form signed by its nurse practitioner Gargiben Patel for urine drug testing of a specimen it claims to have collected from A.A. (Claim No. 054596303) on September 5, 2023.

168.   This prescription form was used to permit a laboratory associated with the defendants to generate charges for purportedly testing the specimen for numerous substances that had nothing to do with the medical management or treatment of A.A.

169.   A.A. later unequivocally testified that she never provided a urine specimen to Novamed, so the prescription form was necessarily falsified.

170.   Another way the defendants did this was by using copied, cloned, and cut-and-pasted language in reports for alleged treatment that make it impossible to determine what medical service, if any, actually was provided on a particular date.

171.   Complete Fitness routinely utilized cloned language and copied treatment notes to create the appearance of medical necessity and to make it appear that the treatments it billed were actually rendered.

172.   For example, Complete Fitness's so-called "Progress Notes" regularly utilized virtually identical language across almost every date of service for a patient and also between different patients.

173.   Nearly every "Progress Note," for example, included an "assessment" stating that the patient tolerated the treatment well and a "plan" to continue physical therapy.

174.   The "Progress Note" for each physical therapy session for each patient also included virtually identical language describing the patient's objective conditions and treatment.

175.   As an example, the following is a portion of a "Progress Note" for an alleged physical therapy session at Complete Fitness for C.W. (Claim No. 055679870) on March 7, 2024:

**Objective:**   THERAPEUTIC EXERCISES, ACTIVITY, & NMES X 30 MIN

CERVICAL: FLEXION, EXTENSION, ROTATION, RETRACTION, SIDEBEND, CHIN TUGS, SHOULDER SHRUGS, & SHOULDER BRACING 10 X 2. NECK STRETCHES 2 X 2.

SHOULDER: FLEXION, EXTENSION, ABDUCTION, HORIZONTAL ABDUCTION/ADDUCTION, ROLLS, SCAPULA RETRACTION, INTERNAL/EXTERNAL ROTATION, SHRUGS, & PENDULUM EXERCISES  10 X 2,

LUMBAR: PPT, SUPINE SLR, BRIDGING, LTR, SKTC, & PRONE HEAD AND CHEST EXTENSION WITH FOREARM SUPPORT 10 REPS X 2 SITTING BACK STRETCHES WITH BALL IN 3 DIRECTION 10 X 2.

STATIONARY BIKE/ THREADMILL X 15 MIN

**Treatment:**   MHP X MIN

ULTRASOUND – MIN, MLS THERAPY X  MIN TO LT SHOULDER

ELECTRICAL STIMULATION X MIN

THERAPEUTIC MASSAGE X  MIN

**Assessment:**   PATIENT TOLERATED WELL WITH THERAPY.

**Plan:**   CONT PT PER POC

176.   The "Objective," "Treatment," "Assessment," and "Plan" portions of the above March 7, 2024 record are nearly identical to a "Progress Note" for C.W.'s

alleged physical therapy session nearly a month later, on April 4, 2024, except that the latter report included a number noting the time allegedly spent on each modality in place of the "X" in the first record:

**Objective:** THERAPEUTIC EXERCISES, ACTIVITY, & NMES X 30 MIN

CERVICAL: FLEXION, EXTENSION, ROTATION, RETRACTION, SIDEBEND, CHIN TUGS, SHOULDER SHRUGS, & SHOULDER BRACING 10 X 2. NECK STRETCHES 2 X 2.

SHOULDER: FLEXION, EXTENSION, ABDUCTION, HORIZONTAL ABDUCTION/ADDUCTION, ROLLS, SCAPULA RETRACTION, INTERNAL/EXTERNAL ROTATION, SHRUGS, & PENDULUM EXERCISES  10 X 2,

LUMBAR: PPT, SUPINE SLR, BRIDGING, LTR, SKTC, & PRONE HEAD AND CHEST EXTENSION WITH FOREARM SUPPORT 10 REPS X 2 SITTING BACK STRETCHES WITH BALL IN 3 DIRECTION 10 X 2.

STATIONARY BIKE/ THREADMILL X 15 MIN

**Treatment:** MHP X 15 MIN

ULTRASOUND – MIN, MLS THERAPY X MIN TO LT SHOULDER

ELECTRICAL STIMULATION X 15MIN, SHOCK WAVE

MANUAL THERAPY X 15 MIN

**Assessment:** PATIENT TOLERATED WELL WITH THERAPY.

**Plan:** CONT PT PER POC

177.   Notably, the above Progress Notes are nearly identical to notes for other patients, such as R.D. (Claim No. 051246048), for whom Complete Fitness submitted the following progress note almost a year earlier, on May 5, 2023:

**Objective:** THERAPEUTIC EXERCISES & NMES X 35 MIN

CERVICAL: FLEXION, EXTENSION, ROTATION, RETRACTION, SIDEBEND, CHIN TUGS, SHOULDER SHRUGS, & SHOULDER BRACING 10 X 2. NECK STRETCHES 2 X 2.

ELBOW- ROM EXERCISES 10 X 2. WRIST- ROM EXERCISES 10 X 2.

LUMBAR: PPT, SUPINE SLR, BRIDGING, LTR, SKTC & PRONE HEAD AND CHEST EXTENSION WITH FOREARM SUPPORT 10 REPS X 2

THORACOLUMBAR: SEATED ROTATION, STANDING EXTENSION 10 X 2

STATIONARY BIKE X 15 MIN

**Treatment:** MHP X 15 MIN

ULTRASOUND -8 MIN TO LT SHOULDER

ELECTRICAL STIMULATION X 15 MIN

MANUAL THERAPY X 15 MIN

**Assessment:** PATIENT TOLERATED WELL WITH THERAPY.

**Plan:** CONT PT PER POC

178.   As further evidence that Complete Fitness's records were simply copied between dates and patients and that they do not reflect a patient's actual condition or treatment, if any, that was rendered, Complete Fitness submitted the same cloned reports on dates that it billed for other alleged services, such as TPII and LINT (services that Complete Fitness first began to bill Liberty Mutual for in April 2023) and did not actually bill for any physical therapy.

179.   As an example, on April 20, 2023, Complete Fitness billed for alleged physical therapy to B.J. (Claim No. 048802630), including billing for alleged manual therapy, neuromuscular reeducation, two (2) units of therapeutic exercise, and one unit of other therapeutic activities, and for which it submitted a "Progress Note" that included the following language:

Objective:   THERAPEUTIC ACTIVITY & BIKE-35 MIN

THORACOLUMBAR: SEATED ROTATION, STANDING EXTENSION, PPT, SLR, BRIDGING, LTR, PRONE HEAD & CHEST EXTENSION, PRONE LEG EXTENSION, & SKTC 10 X 2.

- Abdominal bracing exercises sitting , standing , supine and walking, Pelvic tilts ,
- Isometrics for the spinal extensors,
- Mckenzie's :lumbar extension in prone , single arm and leg lifts in prone progress to alternate arm and leg lifts , graduating to Dog position single arm and leg lifts progressing to alternate arm and leg lifts maintaining the quadruped position and neutral pelvis.
- Posterior Pelvic tilts / Bridging with heel raises, tiny steps, alternate leg raises.
- Partial squats 10 x 2 HAMSTRING STRETCHES 2X 2 15 SECONDS HOLD

Treatment:

ELECTRICAL STIMULATION X 15 MIN TO LOW BACK

MANUAL THERAPY X 15 MIN TO LOW BACK

180.   Shortly thereafter, Complete Fitness began to bill for alleged TPII and LINT to B.J., but continued to submit the same "Progress Note" on dates it billed only for TPII and LINT, such as the following note for an alleged treatment session on June 14, 2023, a day on which Complete Fitness billed only for TPII and LINT:

Objective:   THERAPEUTIC ACTIVITY & BIKE MIN

THORACOLUMBAR: SEATED ROTATION, STANDING EXTENSION, PPT, SLR, BRIDGING, LTR, PRONE HEAD & CHEST EXTENSION, PRONE LEG EXTENSION, & SKTC 10 X 2.

- Abdominal bracing exercises sitting , standing , supine and walking, Pelvic tilts ,
- Isometrics for the spinal extensors,
- Mckenzie's :lumbar extension in prone , single arm and leg lifts in prone progress to alternate arm and leg lifts , graduating to Dog position single arm and leg lifts progressing to alternate arm and leg lifts maintaining the quadruped position and neutral pelvis.
- Posterior Pelvic tilts / Bridging with heel raises, tiny steps, alternate leg raises.
- Partial squats 10 x 2 HAMSTRING STRETCHES 2X 2 15 SECONDS HOLD

Treatment:

ELECTRICAL STIMULATION X  MIN TO LOW BACK

MANUAL THERAPY X MIN TO LOW BACK

Assessment: PATIENT TOLERATED WELL TO THERAPY.

Plan:   CONT PT PER POC

181.   The representative example records above and the other representative examples in this subsection illustrate how the defendants fabricated and

misrepresented the services for which they billed by submitting boilerplate and fabricated records that did not document any actual treatment or patient conditions.

## VIII.  UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES

182.   The defendants violated several Michigan laws and regulations in their effort to bill Liberty Mutual as much as possible, including laws and regulations requiring licensure for the lawful provision of medical treatment and services.

183.   In order to legally issue DME in Michigan, a provider must obtain a license from the Michigan Board of Pharmacy.

184.   A license from the Michigan Board of Pharmacy is required for all "drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or issued in this state . . . ."  Mich. Comp. Laws § 333.17722 (emphasis added).

185.   Defendant Non Opioid Relief routinely billed Liberty Mutual for purportedly dispensing and issuing DME to patients.

186.   Non Opioid Relief never possessed a valid license to issue DME in the State of Michigan at any time relevant to this action.

187.   Despite having no license to issue DME, since April 29, 2023, Non Opioid Relief has billed Liberty Mutual more than $70,000 for DME purportedly issued to Liberty Mutual insureds.  *See* Exhibit 5.

188.   Because Non Opioid Relief did not possess a license to issue DME to patients, said DME was unlawful and not compensable under the No-Fault Act.

189.   Moreover, not only did Non Opioid Relief not possess a license to issue DME, it expressly disclaimed that it was even a healthcare provider at all.

190.   Only healthcare providers are permitted to seek and obtain medical benefits from No-Fault insurers like Liberty Mutual and therefore every claim from Non Opioid Relief was also unlawful and non-compensable for failing to meet this condition.

191.   Liberty Mutual is not required to pay the defendants for DME issued without a license and is entitled to restitution for payments it was induced to make by the defendants' fraudulent bills.

## IX.   UNREASONABLE   AND   UNNECESSARY   FRAUDULENT TREATMENT

192.   The defendants' willingness to falsify records and bill for services that were never rendered or that were rendered unlawfully demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

193.   The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills for submission to Liberty Mutual.

194.   To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment and testing, as discussed more fully below.

195.   The defendants' purported treatment violated standards of care in the medical community, as services were not indicated, redundant, excessive, and repeated without any benefit to patients.

196.   None of the facts discussed herein were known to Liberty Mutual until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Liberty Mutual by the defendants.

197.   The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 6.

198.   All of the claims submitted by the defendants to Liberty Mutual through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

199.   Liberty Mutual is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

### A.   THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL

200.   Liberty Mutual's investigation uncovered a pattern of alleged diagnoses and treatment by the defendants that was applied uniformly to all patients who were claimed to have been involved in motor vehicle accidents and that included (1)

routinely finding substantially similar reports of generalized non-specific complaints, (2) making highly similar, non-specific, and generalized alleged diagnoses, and (3) providing mirrored treatment plans designed to generate charges as quickly as possible.

201.  These predetermined and boilerplate assessments were used to justify the extraordinary amounts of bills submitted to Liberty Mutual for purported treatment, testing, DME, physical therapy, transportation, and other billing submitted by the defendants and their associates.

202.  Many of the services for which the defendants billed, including physical therapy, non-emergency medical transportation, electrodiagnostic testing, and DME, required physician prescriptions.

203.  The defendants used Accurate Care and Novamed to generate fabricated diagnoses and issue disability findings, prescriptions, and orders for testing and services that were not based on the patient's medical needs, but rather in order to generate additional billing to Liberty Mutual.

204.  Accurate Care and Novamed implemented a highly similar predetermined treatment protocol with respect to almost every motor vehicle patient they saw.

205.  At each patient's initial visit and at each follow-up visit, the defendant clinics repeatedly diagnosed multiple "sprains," "strains," and "pain" in order to

create the appearance of significant injuries where they did not exist in order to justify application of the defendants' predetermined treatment protocol that was designed to maximize the amount the defendants billed to Liberty Mutual.

206.  As part of their predetermined treatment protocol, Accurate Care and Novamed routinely ordered multiple x-rays and diagnostic testing such as EMGs and NCS at the initial patient visit or shortly thereafter.

207.  The defendant clinics' predetermined treatment protocol also included prescriptions for DME consisting of a combination of braces, heating pads, pillows cold compression therapy devices, and light therapy wraps that were billed by defendants Nerveana and Non Opioid Relief.

208.  The defendants' predetermined patient orders also included (1) prescriptions for physical therapy, (2) automatic disability findings, including orders for transportation assistance, and (3) follow-up visits approximately every four weeks.

209.  The defendant clinics used the predetermined monthly patient follow-up appointments to continue implementation of their treatment protocol and to generate additional billing through (1) continued disability findings to permit billing for medical transportation by defendant Transcare, (2) continued physical therapy prescriptions for services billed by defendant Complete Fitness, (3) orders for additional testing such as EEGs, (4) referrals for assessments by neurologists and

orthopedists that were billed by other Accurate Care or Novamed physicians, and (5) additional DME billed by defendants Nerveana and Non Opioid Relief.

210.   That the defendants' treatment and services were predetermined and motivated by financial gain rather than medical necessity is exemplified by the defendants' billing with respect to patients T.H. (Claim No. 055238393), a 24-year-old female with a history of scoliosis requiring previous surgery of the cervical, thoracic, and lumbar spine that included the insertion of rods and screws, and D.R. (Claim No. 055238393), a 55-year-old male involved in the same automobile accident as T.H., both of whom were directed to Accurate Care by T.H.'s attorney after her primary care physician found she required no medical treatment as a result of her accident.

211.   T.H and D.R. were allegedly evaluated by two different providers at Accurate Care on the same date approximately two (2) weeks after their alleged accident, at which time Accurate Care implemented the same predetermined treatment protocol for both patients, including immediately ordering DME that included a cervical pillow, back brace, and heating pad that was billed by Nerveana and transportation assistance billed by Transcare.

212.   Despite T.H.'s significant medical history and previous surgery, both T.H. and D.R. were sent to Complete Fitness, which also implemented its standard treatment protocol (that it bills for nearly every patient), used the same copied and

pasted assessments and treatment plans with respect to both T.H. and D.R., and billed for the same services with respect to both patients on almost every purported treatment date.

213.   Because the defendant clinics ordered the same predetermined course of extensive treatment and testing for nearly every patient, regardless of their age, injury, co-morbidities, or status, such treatment was never appropriate.

214.   Treatment and testing that was ordered by the defendant clinics (Accurate Care and Novamed) as a matter of course to generate charges by other defendants was not medically necessary.

### B.    EXCESSIVE AND UNNECESSARY DISABILITY CERTIFICATES

215.   A central component of the defendants' protocol was to provide disability certificates to each patient in order to bolster the appearance of legitimate insurance claims and as an incentive to keep patients returning to them.

216.   As detailed above, these disability certificates were pre-signed by physicians and issued by simply changing dates and not in response to any medical decision making or analysis of patients' actual conditions.

217.   The routine provision of disability certificates and prescriptions was also used to justify the bills for transportation services submitted by defendant Transcare.

218. Accurate Care and Novamed wrote disability certificates for unnecessary transportation services, household assistance, and replacement services, typically on a monthly basis, without regard to the patient's particular medical needs.

219. That these certificates were written as a matter of course is demonstrated by the fact that Accurate Care and Novamed continued to make the same disability findings, including that patients required transportation services and household assistance, even when patients had returned to work or reported that they already were driving on their own.

220. As one example, K.B. (Claim No. 053933795), who worked as an order picker at an Amazon warehouse, allegedly had an initial evaluation at Accurate Care on July 12, 2023 and reported that he had worked the previous day.

221. Accurate Care performed only an extremely limited physical examination, if any occurred at all, and did not find any substantial deficits to support a disability certificate.

222. Despite this, Accurate Care provided K.B. with an unnecessary and unsupported disability finding that he required transportation and housework assistance.

223. At follow up examinations, including on September 13, 2023 and October 6, 2023, K.B. continued reporting that he was working full time and

eventually asked Accurate Care to provide him with a disability finding that stated only that he could not work more than 40 hours a week.

224.   Accurate Care nevertheless continued to issue disability certificates claiming that K.B. required transportation and housework assistance that had no objective basis, were plainly false since K.B. was able to work full time at a physically demanding job, and were made solely to create the appearance of ongoing injury used to justify continued billing for further treatments and services by Transcare.

225.   The defendants' nearly universal provision of disability certificates was not rooted in reasonable medical care, but served instead to ensure the patients would appear at the defendant clinics and to create the appearance of necessity for medical transportation, for which defendant Transcare improperly billed Liberty Mutual.

## C.   EXCESSIVE AND UNNECESSARY ELECTRODIAGNOSTIC TESTING

226.   Defendants Accurate Care and Novamed routinely billed for medically unnecessary electrodiagnostic testing that was not indicated when ordered and was not used to inform patients' courses of treatment.

227.   For EMG and NCS testing to be medically appropriate, the clinical examination must indicate signs of radiculopathy, which is a pathological condition where one or more root nerves along the spine become damaged, causing radiating pain to the part of the body served by the particular nerve.

228.   A patient's subjective symptoms alone cannot properly support the performance of an electrodiagnostic study.

229.   EMG and NCS are not indicated where, as is the case with nearly all patients of the defendant clinics, neurologic deficits are not detected in the patients.

230.   Despite this, the defendant clinics routinely ordered EMG and NCS testing based solely on a patient's subjective reporting rather than as a result of a physical exam, without first making objective findings of abnormal neurology, and without first giving sufficient time for conservative treatments to be effective.

231.   The defendants also did not use the electrodiagnostic testing allegedly performed to inform or influence patients' treatment plans, which were predetermined.

232.   As one example, defendant Accurate Care billed for an alleged initial evaluation of L.P. (Claim No. 055149340) on October 27, 2023, just six (6) days after an alleged automobile accident, at which time Accurate Care performed a limited physical examination.

233.   Accurate Care diagnosed cervical, lumbar, and shoulder sprains, but made no finding that L.P. had any neurological deficits that would warrant ordering immediate EMGs or NCS.

234.   Nevertheless, Accurate Care immediately ordered both EMG and NCS testing of both L.P.'s upper and lower extremities.

235.   Accurate Care billed for an EMG and NCS of the upper extremities on December 1, 2023 and of the lower extremities on December 8, 2023, and in both instances claimed to find "mild" radiculopathy at one vertebral level.

236.   Despite these purported results, when L.P. was re-evaluated by Accurate Care on December 18, 2023, Accurate Care made no changes to L.P.'s treatment plan, continued to recommend the same physical therapy it had previously recommended, and instructed that L.P. return in four (4) weeks for a re-evaluation, demonstrating that the EMG and NCS that Accurate Care ordered and billed for served no medical purpose.

237.   As another example, Accurate Care billed for evaluations of K.B. (Claim No. 053933795) in July and August 2023 following an alleged accident on June 23, 2023, and on both occasions reported that K.B. had neck and cervical pain but was not experiencing any radicular symptoms.

238.   At K.B.'s next evaluation on September 13, 2023, K.B. allegedly reported to Accurate Care that he had experienced "some rare numbness and tingling" in his left hand, and Accurate Care immediately ordered EMG and NCS testing of K.B.'s upper extremities based solely on subjective reporting on that one date.

239.   K.B.'s next evaluation at Accurate Care was on October 6, 2023, and he reported at that time that his neck pain was entirely resolved, yet Accurate Care still proceeded to bill for an alleged upper EMG and NCS on that day.

240.   Predictably, since K.B. was no longer experiencing numbness, tingling, or even pain in his cervical spine, and had only once reported a transient symptom that was not supported by an actual examination, the results of that testing were normal with no evidence of radiculopathy.

241.   In addition to billing for electrodiagnostic testing when not indicated by any objective examination findings (or in many cases, even subjective complaints suggesting radiculopathy), the defendants improperly used a predetermined protocol of muscles subjected to electrodiagnostic testing.

242.   Electrodiagnostic testing is an extension of the clinical exam and should be used, if at all, in accordance with a patient's individualized objective symptoms.

243.   Accordingly, the nature and number of the peripheral nerves and the types of nerve fibers tested in a NCS should be dynamic (i.e., varied from patient to patient), and should never be based on a predetermined protocol.

244.   Likewise, EMG tests should not be conducted pursuant to a predetermined protocol of muscles to be tested.

245.   Patients for whom Accurate Care and Novamed billed Liberty Mutual for EMGs and NCS almost always had testing performed on the same nerves and

muscle groups, regardless of the patients' individual complaints and without regard to the results being found by the physician performing the tests.

246.   Electrodiagnostic testing that is performed pursuant to a predetermined protocol and without medical justification is not compensable pursuant to the No-Fault Act, and Liberty Mutual is entitled to repayment of amounts it was induced to pay by the defendants' misrepresentations.

247.   Liberty Mutual is not required to pay the defendants under the No-Fault Act for EMGs and NCS that were not medically necessary, unsupported by an appropriate medical diagnosis, not used to guide a patient's treatment, or that were ordered solely to generate additional billing.

### D.   UNNECESSARY AND CLINICALLY USELESS EEGs

248.   Defendant Accurate Care's predetermined treatment protocol also included ordering and billing for unnecessary and clinically useless EEGs.

249.   An EEG is a test that detects electrical activity in the brain using small, metal discs (electrodes) attached to the scalp and are primarily used to diagnose seizure disorders and to confirm diagnoses of epilepsy.

250.   None of the patients at issue herein were seeking treatment from the defendants for seizures or epilepsy causally related to motor vehicle accidents.

251.   Patients for whom EEGs were ordered often reported nothing more than headaches immediately following an accident, and typically were not even

diagnosed with a concussion or any type of even mild traumatic brain injury beyond a conclusory statement added to patient reports by the defendant clinics.

252.   There is no clinical diagnostic value to performing EEGs on patients who have suffered no or only mild brain injury, which includes all of the patients at issue herein, nor can EEGs be used to diagnose conditions such a post-concussive syndrome ("PCS") or other conditions in these types of cases.

253.   EEGs do not predict, confirm, or measure PCS, nor can mild EEG abnormality be used to substantiate an objective clinical brain injury, nor can a normal EEG exclude an initial significant brain injury.

254.   As an example of this practice, at an examination at Accurate Care on February 7, 2023, just three (3) days before her purported EEG, R.D. (Claim No. 051246048) reported complaints of neck pain, low back pain, and shoulder pain, but Accurate Care's report made no mention of a claimed head or brain injury or that it was ordering an EEG at that time.

255.   When Accurate Care next evaluated R.D., approximately three (3) weeks after the alleged EEG, it claimed that R.D. had complaints of headaches and diagnosed her with a closed head injury, but again did not diagnose any condition for which an EEG would have been appropriate, and did not mention the results of the EEG that was allegedly performed or indicate that the EEG was used in any way in the diagnosis or treatment of R.D.

256.   Accurate Care also improperly billed for the alleged interpretation of ambulatory EEG test results using CPT code 95957.

257.   CPT Code 95957 is only appropriately used when a physician must analyze "spikes" in the data recorded during an EEG, and only when a patient is diagnosed with intractable epilepsy.

258.   None of the patients at issue herein were diagnosed with intractable epilepsy, and therefore none of the claims submitted by Accurate Care using CPT code 95957 were ever medically necessary or appropriate.

259.   That EEGs were not ordered by the defendants for any reason other than generating charges is also confirmed by the fact that they were not used to guide further treatment and in most cases the results were not mentioned or reviewed at all.

260.   For example, Accurate Care immediately ordered a battery of vestibular tests, including an EEG, for B.A. (Claim No. 052851003) immediately upon her presentation to the clinic.

261.   Accurate Care then billed nearly $5,000 for these tests that were allegedly administered by a neurologist named Tessy Jenkins, M.D. using eVox software on June 7, 2023.

262.   On July 6, 2023, nearly a month after the testing was allegedly completed and billed, B.A. returned to Accurate Care, which reported that her closed head injury testing was still "pending."

263.   Accurate Care then never mentioned the purported vestibular testing and EEG to B.A. again and did not use the results in any way to guide future care.

264.   EEG testing that is not ordered for purposes of diagnosing or treating any actual injury or medical condition is not medically necessary and is not payable under the No-Fault Act.

### E.    MEDICALLY UNNECESSARY AND EXCESSIVE PHYSICAL THERAPY

265.   The physical therapy services prescribed by Accurate Care and Novamed and billed by defendant Complete Fitness were not designed or intended to treat patients' actual injuries, but rather were used as a means to generate billing.

266.   Valid physical therapy treatment requires the services be objectively indicated and cannot be based on a patient's subjective complaints of pain alone.

267.   Contrary to these guidelines, Complete Fitness billed for the same collection of up to six (6) physical therapy services for nearly every patient on every date of service, including ultrasound therapy, therapeutic exercise, neuromuscular reeducation, manual therapy, therapeutic activity, and electronic stimulation.  *See* Exhibit 3.

268.   Demonstrating the extent to which Complete Fitness billed for the same predetermined services for every patient, excluding one patient for whom Complete Fitness billed on only a single day, 100% of the patients for whom Liberty Mutual received billing from Complete Fitness for the period from August 2022 to the present allegedly received ultrasound therapy, neuromuscular reeducation, and electronic stimulation.  Id.

269.   During the same period, Complete Fitness also billed for manual therapy and therapeutic activity with respect to more than 85% of those patients.  Id.

270.   Complete Fitness billed for at least five (5) of the six (6) of its predetermined physical therapy services on more than half of all dates of service it billed for each patient.  Id.

271.   As one representative example, Complete Fitness billed for physical therapy to J.U. (Claim No. 050552537) on 148 dates, and billed for therapeutic exercise, therapeutic activities, neuromuscular reeducation, manual therapy, and electrical stimulation on 98% of those dates, and also billed for ultrasound therapy on at least 67 of those dates.

272.   Similarly, Complete Fitness billed for each of therapeutic exercise, therapeutic activities, neuromuscular reeducation, manual therapy, electrical stimulation, and ultrasound therapy on 58 of 60 dates of service it billed with respect to C.T. (Claim No. 050873971).

273. Physical therapy that is billed for every patient automatically, instead of based on objective indications specific to the particular patient's needs, is not medically necessary.

274. In addition to billing for virtually the same course of physical therapy for almost every patient, Complete Fitness also billed these predetermined treatments for excessive amounts of time and continued to do so even when the patients received no benefit from the physical therapy.

275. Patients should rarely undergo physical therapy for more than four (4) to six (6) weeks, as after such time the physical therapy will have reached its maximum benefit and the patient should either cease in-office physical therapy or be recommended for a different type of treatment.

276. When a patient is no longer making objective progress in physical therapy, the treatment plan must be changed or the patient discharged.

277. Contrary to these guidelines, Complete Fitness almost never altered patients' treatment plans and continued to recommend and bill for continued physical therapy.

278. Complete Fitness routinely billed Liberty Mutual for physical therapy multiple times a week that often continued for many months, and it did so without ever substantially altering patients' treatments and without regard to whether treatment was helpful.

279.   Indeed, while Complete Fitness frequently billed for purported patient re-evaluations, those evaluations almost never resulted in a change in treatment recommendations or services billed by Complete Fitness.

280.   As one example, Complete Fitness billed for physical therapy treatment allegedly rendered to B.J. (Claim No. 048802630) on 70 dates of service during an eight (8) month period from August 2022 through April 2023.

281.   During that period, Complete Fitness allegedly performed numerous "re-evaluations" of B.J., yet never altered his treatment plan throughout that time and instead simply utilized cut-and-pasted language in each of its evaluation reports.

282.   As part of an alleged re-evaluation of B.J. on January 17, 2023, for instance, Complete Fitness reported that B.J.'s low back pain for which he was being treated was "much reduced" and that B.J. rated his pain as just a 2 or 3 out of 10.

283.   In spite of this claimed improvement, Complete Fitness recommended that B.J. continue the same course of treatment at the same frequency of 2 to 3 times a week it previously had followed, and it continued to bill for the same treatments it had billed on each date of service during the preceding several months.

284.   Nearly three (3) months later, Complete Fitness billed for another re-evaluation of B.J., reporting at that time that his pain had increased to a 3 or 4 out of 10, meaning that despite three (3) additional months of physical therapy, B.J.'s pain had worsened, not improved.

285.   Despite previously asserting that treatment would only continue if B.J. improved, Complete Fitness's April treatment plan for B.J. remained identical to its January treatment plan, with virtually the entire patient assessment portion of the evaluation report, and the entirety of the sections of the report setting out the objection assessment that Complete Fitness allegedly performed, the long term treatment goals, and the treatment plan copied verbatim from the January report.

286.   As another example of the defendants' use of excessively long treatment periods whose only possible purpose was to generate billing and not to address patients' actual needs, Complete Fitness billed for alleged physical therapy to J.U. (Claim No. 050552537) on an incredible 148 dates of service over a period of twenty-one (21) months.

287.   Similarly, Complete Fitness billed for physical therapy it allegedly performed on J.H. (Claim No. 051208257) on 100 dates of service over a period of over fourteen (14) months, and it billed on 95 dates of service over a period of over fourteen (14) months with respect to R.D. (Claim No. 051246048).

288.   Physical therapy that is not ordered or designed to treat an actual injury or medical condition and that is not based on a patient's individualized needs is not medically necessary and is not payable under the No-Fault Act.

## F.   UNNECESSARY TPII AND LINT

289.   Defendants Accurate Care, Novamed, and Complete Fitness began billing for TPII and LINT because they believed that by doing so they could continue to demand unlimited and uncapped benefits from insurers like Liberty Mutual despite the No-Fault Act's implementation of a statutory fee schedule by billing for purported services that are not covered by Medicare's or the No-Fault Act's fee schedule because they are experimental, unproven, and unnecessary.

290.   These alleged TPII and LINT treatments consisted of nothing more than purporting to identify and attempting to relieve trigger points, which are discrete, focal, irritated spots in a skeletal muscle, through electrical stimulation, and are the same services typically billed by physicians, chiropractors, and physical therapists for a small fraction of the amount billed by the defendants, and which services would have been subject to Michigan's No-Fault Act's fee schedule if billed as such.

291.   Trigger points are easily identified by routine manual evaluations, and can be and routinely are addressed with simple treatments such as massage, application of cold packs, application of hot moist packs, ultrasound, electrical muscle stimulation, acupuncture, trigger point injections, and a variety of other methods.

292.   There is no evidence that LINT provides any therapeutic benefit beyond traditional methods of chiropractic treatment and physical therapy.

293.   In fact, Michigan courts have determined there is no evidence that LINT is effective in treating the conditions for which it is intended to be used at all, and therefore TPII and LINT are not compensable at all under the No-Fault Act.

294.   Despite this, the defendant clinics billed for TPII and LINT without establishing any medical basis for such treatment, including when it was never ordered by any medical provider or included in patients' treatment plans.

295.   For example, on July 5, 2024, Accurate Care billed for alleged TPII and LINT to E.H. (Claim No. 056038987).

296.   The prescription form that was submitted by Accurate Care for this alleged service was claimed to have been signed by Darrah, but not until July 15, 2024, ten (10) days after the treatment was supposedly rendered.

297.   Accurate Care also billed for an alleged evaluation by Darrah on July 15, but it was not mentioned that TPII or LINT had been performed or would be part of E.H.'s treatment plan going forward.

298.   Each time Accurate Care, Novamed, and Complete Fitness claimed to render TPII and LINT services, they typically charged $6,000 or more for these experimental, unproven, and medically unnecessary procedures.

299.   As one example of the defendants' billing for unnecessary TPII and LINT, Complete Fitness billed Liberty Mutual $6,000 for alleged TPII and LINT

administered to the lumbar region of B.J. (Claim No. 048802630) for the first time on May 3, 2023.

300.   At the time, B.J. already had been undergoing physical therapy at Complete Fitness for nearly nine (9) months and had been re-evaluated less than a month earlier, at which time Complete Fitness made no findings that B.J. was a candidate for TPII and LINT and did not order or recommend TPII and LINT for B.J.

301.   In fact, B.J.'s treatment plan in April 2023 was identical to Complete Fitness's treatment plan for him three (3) months earlier, in February 2023.

302.   When Complete Fitness allegedly performed another re-evaluation of B.J. on May 9, 2023, just six (6) days after he first allegedly began receiving TPII and LINT treatment (and that Complete Fitness billed for performing on an additional nine (9) dates after that re-evaluation), it did not assess the effectiveness of the LINT treatment, and again failed to order, recommend, or even mention the TPII and LINT.

303.   Even if it was effective at treating myofascial pain, which is the intended purpose of TPII and LINT, the treatment was not medically necessary or appropriate, and in fact was completely useless for B.J., since the medical clinic that had prescribed physical therapy for B.J. had diagnosed B.J. with a lumbar disc herniation, not myofascial pain.

304.   As another example, Novamed billed Liberty Mutual $6,300 for TPII and LINT allegedly performed on D.C. (Claim No. 054024573) on May 8, 2024 that had no medical justification.

305.   On the same date that Novamed billed for TPII and LINT for D.C., and consistent with its predetermined treatment protocol discussed previously, Novamed also issued a disability certificate that asserted, among other things, that D.C. had cervical and lumbar disc disease and that he had a previous lower back surgery, not any condition that could conceivably support an order for experimental TPII and LINT.

306.   In addition to ordering unnecessary TPII and LINT for patients with conditions the treatment was never intended to address, the defendants also improperly ordered and billed for courses of TPII and LINT that were far longer than appropriate and that were not indicated by the treatment standards and recommendations of the manufacturer of the Nervomatrix machines.

307.   According to the CEO of the company that created the Nervomatrix machine, LINT treatment should involve (6) sessions over approximately three (3) weeks, and pain should then subside for four (4) months.

308.   The defendants ordered and billed for many times this amount of treatment to multiply their charges to Liberty Mutual.

309. As an example, on November 8, 2023, Novamed initially prescribed and billed for TPII and LINT treatment for A.A.'s (Claim No. 051614218) reported lumbar pain, setting a course of treatment of once a week for eight (8) weeks, a duration that exceeded the manufacturer's recommendations.

310. Novamed ordered the TPII and LINT for A.A. despite diagnosing him with an annular tear at vertebral level L5-S1 that had previously been identified in MRIs ordered by another provider, and despite the fact that both A.A.'s previous physician and the physical therapy clinic treating A.A. at that time both reported A.A. was experiencing radiating lower back pain, not myofascial pain that would indicate he was a candidate for the experimental TPII and LINT treatment.

311. Novamed initially billed for just one (1) round of TPII and LINT treatment, but never assessed or reported whether the treatment was beneficial, before altering its treatment recommendation for A.A. to multiwave locked system ("MLS") laser therapy, which itself indicates that Novamed knew that the TPII and LINT was not medically appropriate for A.A., without any explanation.

312. After billing for three (3) courses of MLS laser therapy, which Novamed also never evaluated the effectiveness of, and even though the initial TPII and LINT apparently had not been beneficial, on March 20, 2024, Novamed again prescribed TPII and LINT for A.A., this time ordering that it occur twice a week for

a period of eight (8) weeks, which is nearly three (3) times the number of treatments recommended by the manufacturer.

313.   The defendants implemented these unnecessary and improperly long courses of TPII and LINT treatment without ever assessing whether the treatments were effective and should continue.

314.   For example, B.J. allegedly received TPII and LINT at Complete Fitness on at least ten (10) dates over a period of approximately ten (10) weeks, during which neither Complete Fitness nor the physician that ordered the treatment ever assessed whether it was beneficial.

### G.   UNNECESSARY LASER THERAPY

315.   Accurate Care, Novamed, and Complete Fitness routinely billed Liberty Mutual exorbitant amounts, typically $5,900, for medically unnecessary MLS laser therapy that their own records indicate took just ten (10) minutes to perform.

316.   MLS laser therapy is a type of "cold laser therapy" and is also known as low-level or low-power laser therapy (LLLT or LPLT) and uses red or infrared light to purport to stimulate cells.

317.   Cold laser therapy is another unproven and medically unnecessary treatment that the defendants have adopted in order to thwart the Michigan No-Fault medical fee schedule by billing for treatment that is not on that fee schedule.

318.   MLS laser therapy and other cold laser devices have not been approved to treat any musculoskeletal conditions and there is scant medical evidence that they provide any relief beyond a placebo effect.

319.   Accurate Care, Novamed, and Complete Fitness fraudulently billed this purported treatment using CPT code 97039, which describes an "unlisted modality."

320.   The proper code to use when billing for cold laser therapy (if any billing is proper at all) is either CPT code 0552T (from July 1, 2019 – December 31, 2023) or CPT code 97037 (effective January 1, 2024).

321.   The defendants billed for an "unlisted modality" to conceal the fact that they were billing for a listed modality that is not medically necessary.

322.   Like other modalities billed by the defendants, purported laser therapy also was repeated without any apparent impact on patients' conditions or reports of pain, and even when the purported treatments were not even done to the correct areas of the body.

323.   As an example, Accurate Care ordered MLS laser therapy for R.D. (Claim No. 051246048) on July 20, 2023 that, according to its evaluation report for that date, was intended to manage R.D.'s left shoulder pain.

324.   However, the prescription form completed by Accurate Care that day, which called for treatment three (3) times a week for four (4) weeks, did not identify the area of the body on which the MLS laser therapy was to be applied.

325. As a result, Complete Fitness began billing for MLS later therapy to R.D.'s lower back on August 2, 2023, and continued to do so throughout August and September.

326. At a re-evaluation on August 11, 2023, Accurate Care did not address the MLS laser therapy treatment at all or indicate any awareness that R.D. had not been receiving the treatment to the correct part of her body, yet still ordered an additional month of the treatment.

327. The report from Accurate Care's next purported re-evaluation of R.D. on September 6, 2023 actually asserted that "laser therapy has been helpful," but still did not express any awareness that the treatment was not being applied to R.D.'s left shoulder as intended, meaning that it could not have actually evaluated whether the treatment was working.

328. Despite this, Accurate Care again prescribed an additional month of MLS laser therapy for R.D. that served no possible medical purpose since it was not being performed on the area of her body for which it was intended.

329. In many cases, Accurate Care and Novamed billed for purported MLS laser therapy without even generating any medical record at all identifying the body part allegedly treated or any details about the purported treatment.

330.    In these cases, the only records that were submitted were the patient referral and registration forms, both of which had copied-and-pasted physician signatures as detailed and exemplified above.

331.    Treatments such as MLS laser therapy that are not used to treat actual medical conditions, that are not even used on parts of the body for which they are recommended, and that are included in treatment plans as a matter of course in order to generate bills and not because they were medically necessary or appropriate are not compensable.

332.    Liberty Mutual is not required to remit payment for these treatments, and it is entitled to recover all amounts it was induced to pay to the defendants for these treatments as a result of the defendants' wrongful conduct.

### H.    UNNECESSARY DME

333.    Defendants Non-Opioid Relief and Nerveana billed for DME that was not appropriate for the medical conditions diagnosed and was simply ordered as part of the defendants' predetermined treatment protocol.

334.    Non Opioid Relief has repeatedly billed Liberty Mutual thousands of dollars for "On Lux Light Therapy" wraps that are unproven to possess any medical utility at all.

335.    As discussed above, patients did not even understand what these devices are intended to do and have described them as "braces," which they are not.

336.    There is no record of the Food and Drug Administration ("FDA") ever approving this specific branded device and the manufacturer's own website claims only that its devices are "listed" with the FDA under the "ILY" product code, which refers to a category of therapeutic heating lamps for which the FDA does not require premarket notification because they are considered to have a low risk of causing injury, but that does not indicate any determination of effectiveness in treating any condition or FDA approval of the device for use in treatment of any condition.

337.    Non Opioid Relief created prescription forms for its devices to create the appearance that they are a legitimate treatment and to attempt to justify the ridiculous amounts charged.

338.    In fact, the light therapy wraps billed by Non Opioid Relief rarely if ever had any identified purpose and were rarely if ever evaluated by the provider who allegedly prescribed the devices.

339.    For example, on April 29, 2023, Non Opioid Relief billed $6,985 each for a lumbar On Lux Light Therapy wrap and a neck On Lux Light Therapy wrap that had allegedly been prescribed to A.P. (Claim No. 047566557) almost two (2) months earlier, on March 8, 2023.

340.    The provider's evaluation report from March 8, 2023 makes no mention of ordering the DME and does not include any reason for ordering the two (2)

devices despite identifying every other service it ordered for A.P. that day, proving that there was no medical reason for A.P. to receive these devices.

341.   As further evidence of the lack of any medical necessity for the On Lux Light Therapy wraps billed by Non Opioid Relief, A.P. had another examination with the same provider on April 12, 2023, at which time the provider expressed no concern that, more than a month later, the devices had not been delivered to A.P. or that she had been unable to use them for "treatment," and in fact did not mention the devices, their use, or their lack of use at all in the evaluation report for that date.

342.   Similarly, Non Opioid Relief billed for allegedly issuing On Lux wraps to B.A. (Claim No. 052851003) on February 28, 2024 that were supposedly ordered by Accurate Care more than six (6) months earlier on August 2, 2023.

343.   Despite billing for numerous intervening evaluations, no physician at Accurate Care ever questioned why B.A. had not received the devices, evaluated whether she still needed them prior to alleged delivery, or questioned whether she was using them or whether they were efficacious after they were supposedly finally delivered to her.

344.   This lengthy gap between the order and delivery of the items further confirms that they were not actually medically necessary for treatment of the patient.

345.   Following a practice similar to Non Opioid Relief, Nerveana billed enormous amounts for BREG cold Polar Care Wave compression devices ("BREG

devices") that were prescribed by its co-defendants for orthopedic and/or soft tissue injuries, and for which it created its own prescription forms to create the appearance of legitimacy but in fact were medically unnecessary.

346.   BREG devices have been approved by the FDA for use "in extremities to prevent and reduce complications of poor circulation," and the FDA approval summary also includes a list of medical conditions for which the device is indicated, which are primarily limited to vein and circulation disorders, open wounds, and post-surgical treatments.

347.   To the extent the type of cold compression therapy purportedly provided by these devices is ever medically appropriate for orthopedic and/or soft tissue injuries, it is only during the acute phase of injury or in the immediate aftermath of surgery.

348.   Contrary to these indicated uses and in order to generate the maximum amount of bills for submission to Liberty Mutual, Nerveana regularly issued BREG cold compression devices to patients who had not undergone surgery and many months after their alleged accidents and who, if they were injured at all, were in the chronic rather than acute stage of injury.

349.   As one example of the defendants' improper orders for these cold compression devices, Nerveana billed for allegedly renting a cold compression device to B.J. (Claim No. 042448436) on May 14, 2023 based on a prescription form

stating that the patient needed the device for use after post-arthroscopic surgery on her shoulder.

350.   B.J. did not actually have her surgery scheduled until July 10, 2023, but Nerveana billed for the rental for the entire two-month period between May 14, 2023 and the date of surgery – at a rate of $6,900 per month – even though B.J. clearly did not need the device during that time period and the device was not prescribed for use during that time period.

351.   As another example of the defendants' improper orders for these cold compression devices, Novamed billed for an initial examination of D.C. (Claim No. 054024573) on February 21, 2024, which was more than six (6) months after his alleged auto accident, meaning D.C. was no longer in the acute phase of any injury.

352.   At that time, Novamed noted that D.C. had radiating neck pain and diagnosed him with a cervical disc herniation and cervical facet syndrome, which are chronic conditions for which cold compression therapy is not a recognized treatment.

353.   Despite its evaluation report from February 21, 2024 making no mention that it was prescribing such treatment, Novamed allegedly completed a Nerveana prescription form for a 90-day cold compression rental that it indicated was for use on the cervical spine and was to have a set up type of "surgical" even though D.C. had not undergone any surgery.

354.   Nerveana billed Liberty Mutual $6,900 for the rental of this device that served absolutely no medical purpose and that Nerveana never mentioned or assessed the usefulness of in any subsequent evaluation of D.C.

355.   Other DME that was routinely billed by Nerveana was allegedly given to patients in bundles typically including braces, pillows, heating pads and electronic stimulation units.

356.   This DME was ordered on a *pro forma* basis and had nothing to do with actual medical need.

357.   As just one example, on April 15, 2024, Nerveana billed for issuing a cervical pillow, a heating pad, and a stimulation unit to B.A. (Claim No. 052851003).

358.   The Accurate Care record that purportedly explained the order of these items did not mention a heating pad at all but did mention a back brace, which was not given to B.A.

359.   DME that was unnecessary and improper for patients' condition is not compensable under the No-Fault Act.

360.   Liberty Mutual is not required to pay the defendants for DME that is unnecessary, and is entitled to a return of monies it paid to the defendants for medically unnecessary DME.

## I.   UNNECESSARY MEDICAL TRANSPORTATION ASSISTANCE

361.   Accurate Care and Novamed used improper inducements to persuade people who were involved in alleged motor vehicle accidents to treat with them even if they were uninjured and no treatment was necessary.

362.   One of the typical inducements offered by the defendant clinics was unnecessary transportation services to the clinics and to Complete Fitness, often billed by defendant Transcare.

363.   To create the appearance that bills submitted by Transcare were necessary (i.e., that the patient actually required transportation services due to injury), Accurate Care and Novamed provided disability forms to patients who used this service.

364.   Transcare used the disability certificates to bill exorbitant charges for unnecessary transportation.

365.   Some patients, such as D.R. (Claim No. 055238393), were allegedly transported by Transcare on their first date of service, before they were even evaluated by the defendant clinics, which illustrates the findings of supposed disability were predetermined and *pro forma*.

366.   Other patients, such as K.B. (Claim No. 053933795), clearly did not require medical transportation services based on their clinical presentations and reported conditions.

367. Transcare billed for routine alleged transportation of K.B. for nearly half a year from July 12, 2023 to January 5, 2024 despite the fact that K.B. was able to work, with Accurate Care's approval, full time in a warehouse job during almost that entire period.

368. If K.B. had any persistent injuries at all throughout that period, they did not actually prevent him from driving and Transcare's bills for such services were unnecessary.

369. One way that the defendants attempted to issue unnecessary disability certificates to generate charges was to make exceptions, such as purportedly telling patients they could not drive except in specific circumstances or for limited distances.

370. If a person is injured to the point of being impaired from driving, it is not possible that they are able to drive to work and social activities but not to doctor appointments (the latter of which being the defendants' chosen method of generating charges).

371. For example, A.A. (Claim No. 054596303) was repeatedly issued disability certificates from Novamed stating that she was restricted from driving except for "short distances."

372.   During the period these restrictions were issued, A.A. confirmed that she was in fact driving and was attending cosmetology school (which also required physical activity).

373.   Moreover, Transcare routinely billed for transporting A.A. to her medical appointments despite also reporting that the transportation was just 11.6 miles round trip, which is clearly a "short distance" that A.A. was able to drive herself even under Novamed's inappropriate restriction.

## X.    FRAUDULENT BILLING PRACTICES

374.   The medical records, bills, and invoices submitted to Liberty Mutual by the defendants contained standardized billing codes.

375.   Providers like the defendants have a responsibility to select and submit billing codes that accurately and truthfully identify services performed and the complexity involved in rendering those services.

376.   The defendants failed to meet this responsibility and instead submitted bills with unreasonable charges to Liberty Mutual for medically unnecessary, unlawful, and excessive services and used fraudulent billing practices, as discussed *infra*.

377.   All of the medical records, bills, and invoices submitted to Liberty Mutual by the defendants contained CPT and Healthcare Common Procedure Coding System ("HCPCS") codes.

378.   By utilizing CPT and HCPCS codes to submit billing to Liberty Mutual, the defendants represented that the services they billed for corresponded to and were accurately described by the published descriptions for the CPT and HCPCS codes they chose.

379.   The defendants never communicated to Liberty Mutual that they intended that the CPT and HCPCS codes they used to submit bills have any meanings other than those ascribed by the AMA and the Centers for Medicare and Medicaid Services ("CMS"), which publish CPT and HCPCS codes, respectively.

380.   Liberty Mutual reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the defendants.

381.   The bills submitted to Liberty Mutual by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

382.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

383.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Liberty Mutual through interstate wires and the U.S. Mail.

384.   The defendants knowingly submitted false, incomplete, and misleading bills to Liberty Mutual, including submitting bills that included inaccurate and inappropriate CPT and HCPCS codes for the services they allegedly provided, with the intention that Liberty Mutual rely on those bills in order to make payments to the defendants to which they knew they were not entitled.

385.   Liberty Mutual relied on the bills submitted by the defendants to its detriment and was induced to make payments to the defendants to which they were not entitled as a result of the defendants' fraudulent billing practices.

A.   <u>FRAUDULENT MULTIPLE BILLING</u>

386.   Accurate Care frequently billed Liberty Mutual multiple times for medically unnecessary diagnostic testing that did not actually occur, typically billing Liberty Mutual for EEGs using CPT code 95816, nonautomated follow-up electrophysiologic testing using CPT code 92651, visual evoked potential testing using CPT code 95939, digital analysis of an EEG using CPT code 95957, and psychological/neuropsychological testing using CPT code 96146 on the same date of service.

387.   To the extent any testing occurred at all, it was performed using eVox, which is an automated hardware and software system that performs EEGs and electrocardiography ("ECG") testing in approximately 25 minutes.

388.   According to a coverage determination published in April 2019 by CMS, testing that is performed using the eVox system should only be billed as a single service using CPT code 95999 (which describes "other" neurology and neuromuscular procedures), and should not be billed separately using CPT codes such as those billed by Accurate Care listed above, which describe separate, specifically defined neurology procedures.

389.   Thus, every time Accurate Care billed for five (5) different diagnostic tests when it actually had only performed testing using eVox, it fraudulently billed Liberty Mutual five (5) times for a single test.

390.   Accurate Care charged Liberty Mutual more than $4,800 each time it billed for this alleged testing, resulting in tens of thousands of dollars in fraudulent bills, when in fact it had performed a test that required only a few minutes to perform and that should have been billed for, at most, a few hundred dollars.

### B.   FRAUDULENT UPCODING

391.   As discussed above, the defendants made misrepresentations to Liberty Mutual by submitting documentation that included CPT codes for medical services that (1) were not actually performed, (2) were not performed consistent with standards of care, and (3) were wholly unwarranted and unnecessary.

392.   The billing codes submitted to Liberty Mutual by Accurate Care and Novamed also consistently exaggerated the complexity of evaluations purportedly rendered in order to inflate the charges submitted to Liberty Mutual.

393.   Physician examinations of patients are billed using CPT codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT code for the complexity of the examination.

394.   Initial office visits/examinations are billed using a CPT code that starts with the numbers "9920"; re-examinations are billed using a CPT code that starts with the numbers "9921"; and consultations are billed using a CPT code that starts with the numbers "9924."

395.   The final number to complete each five-digit CPT code for examinations and consultations reports the complexity of the evaluation performed, with five (5) being the highest complexity evaluation possible.

396.   To properly bill using level 5 complexity codes, the physician must have taken a comprehensive history, performed a comprehensive examination, and engaged in medical decision making of high complexity.

397.   To properly bill using level 4 complexity codes, the physician must have taken a comprehensive (initial encounter) or detailed (re-evaluation) history, performed a comprehensive (initial encounter) or detailed (re-evaluation) examination, and engaged in medical decision making of moderate complexity.

398.   The AMA has guided that level 5 initial examinations should involve approximately 60 minutes of face-to-face time with the patient, and level 5 re-examinations should involve approximately 40 minutes of face-to-face time with the patient.

399.   Level 4 examinations typically involve 45 minutes of face-to-face time, and level 4 re-examinations typically involve 25 minutes of face-to-face time.

400.   To warrant a medical bill demanding payment for a level 4 examination, the injury/condition necessarily requires: moderate risk of mortality, morbidity and/or complications; moderate diagnoses and review of complex data; and requires the medical provider to: (1) obtain comprehensive patient histories; (2) conduct comprehensive examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

401.   Since it began billing Liberty Mutual in October 2022, every initial patient examination for which Accurate Care has billed Liberty Mutual has been billed as a level 4 or 5 examination. *See* Exhibit 1.

402.   During the same period, Accurate Care billed Liberty Mutual for level 4 or higher re-examinations 90% of the time, and never billed for lower than a level 3 re-examination. Id.

403.   Since it began billing Liberty Mutual for patient evaluations in November 2023, Novamed has never billed Liberty Mutual for less than a level 4 initial examination or re-examination.  *See* Exhibit 2.

404.   Accurate Care and Novamed routinely billed examinations and re-examinations at level four and level five even though they do not come close to meeting the requirements established by the AMA to bill office visits at a level four or level five.

405.   As previously described, many of the defendants' records are largely copied and pasted between appointments and treatment plans following initial evaluations, and recommend a similar course of treatment for nearly every patient.

406.   Reports for patient re-examinations almost always simply continue the same course of care that had already been prescribed (regardless of whether such course of care was improving the patients' conditions), and nearly every report copies from previous evaluation reports with only minor additions and changes.

407.   Reports also use the same copied-and-pasted language to describe each evaluation, demonstrating that the evaluations did not satisfy the level of complexity in the examination and decision making performed required of the billing submitted by the defendants.

408.   For these patient appointments resulting in formulaic reports and records based on the predetermined treatment protocol described above, the

defendants improperly upcoded bills to represent alleged complex medical evaluations.

409.   The defendants engaged in this improper and fraudulent upcoding in order to increase the amount they were able to bill to Liberty Mutual for patient appointments.

410.   As one example of the defendants' failure to satisfy the required complexity of decision making and the thoroughness of patient evaluations necessary to bill for a level 4 re-examination, Accurate Care billed Liberty Mutual using CPT code 99214 for a re-examination of O.D. (Claim No. 055433458) on February 12, 2024.

411.   The report prepared for the re-examination of O.C., which comprised less than a single page, indicates that Accurate Care obtained only a "Brief History" of the patient's condition and reflects a limited examination that the report described as "unremarkable."

412.   Further, the only conditions diagnosed by Accurate Care were a cervical sprain and lumbar sprain and its plan was merely to renew prescriptions already made, all of which prove that Accurate Care did not engage in the type of complex decision making required to justify the billing it submitted for the examination.

413.   All bills submitted to Liberty Mutual by the defendants using CPT codes 99204, 99205, 99214, and 99215 as a matter of course rather than based on an independent assessment of the complexity of medical decision making were fraudulent.

## XI.   EXCESSIVE AND UNREASONABLE CHARGES

414.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

415.   The defendants knew that the amounts they billed Liberty Mutual were unreasonable at the time the charges were submitted and intentionally billed these excessive and unreasonable amounts as part and in furtherance of their scheme to defraud Liberty Mutual by inducing it to pay the defendants monies they were not entitled to receive.

416.   The potential of receiving a windfall to which they were not entitled by charging unreasonable and excessive amounts also motivated the defendants' decision to bill Liberty Mutual for treatment not rendered and unlawful and unnecessary treatment, and was their motivation to resort to fraudulent billing practices as described *supra*.

417. In each such case, including those described in the following subsections, Liberty Mutual was harmed when it was induced to pay the unreasonable amounts billed by the defendants.

418. Liberty Mutual also was harmed even when it did not pay the unreasonable and excessive amounts charged by the defendants, because it was nevertheless obligated to investigate and adjust each insurance claim thereby incurring costs.

### A. EXCESSIVE AND UNREASONABLE CHARGES FOR EXPERIMENTAL AND UNPROVEN TREATMENT

419. Because their goal was to bill as much as possible for each patient, the defendants regularly ordered and billed for experimental, unproven, and unapproved treatments and services that had little if any utility in the context of the kinds of orthopedic and soft tissue injuries allegedly experienced by the vast majority of patients that were allegedly examined and treated by the defendants at issue in this case.

420. The defendants ordered and billed for these experimental, unproven, and unnecessary treatments specifically because they are not included in Medicare's or the No-Fault Act's fee schedule and the defendants believed that by doing so they could circumvent the No-Fault Act's implementation of a statutory fee schedule and continue to demand unlimited and uncapped No-Fault benefits from insurers like Liberty Mutual.

421.   Even setting aside the issues detailed in the preceding sections of this Complaint that these treatments were experimental, not indicated for patient's conditions, unapproved, and medically unnecessary, the defendants also charged excessive and unreasonable amounts for these services.

422.   One such experimental and unapproved treatment was the TPII and LINT that was allegedly performed using equipment called Nervomatrix machines and billed by Accurate Care, Novamed, and Complete Fitness.

423.   Each time these defendants billed for this experimental, unnecessary, and ineffective treatment, they billed both for testing that allegedly identified trigger points to be treated ("TPII," for which they typically billed $1,500), and billed separately for the treatment ("LINT," for which they generally billed $4,500).

424.   These defendants have billed Liberty Mutual hundreds of thousands of dollars for TPII and LINT during the period at issue in this case.  *See* Exhibits 1 through 3.

425.   As previously explained, however, these same testing and treatment services are routinely performed by physicians, chiropractors, and physical therapists without the use of a Nervomatrix machine for a small fraction of the amount billed by the defendants, and which services would have been subject to Michigan's No-Fault Act's fee schedule if billed as such.

426.   Indeed, the Nervomatrix machines were approved for use by the FDA as a transcutaneous electrical nerve stimulation ("TENS") device.

427.   TENS treatment is a routine procedure that is covered by the No-Fault Act's fee schedule and paid at a tiny fraction of the amount billed by these defendants.

428.   These defendants' charges of approximately $6,000 each time they billed for TPII and LINT were grossly excessive and unreasonable.

429.   Another service frequently billed by the defendants that was experimental, unproven, and medically unnecessary in the context of the types of injuries at issue with respect to the patients at issue in this action was MLS laser therapy.

430.   Accurate Care, Novamed, and Complete Fitness fraudulently billed this purported treatment as an "unlisted modality," charging Liberty Mutual $5,900 on each occasion it was allegedly performed, and have billed Liberty Mutual more than $241,000 for MLS laser therapy during the period at issue in this case.  Id.

431.   The amounts billed by Novamed and Complete Fitness for MLS laser therapy, none of which was medically necessary, were grossly excessive and unreasonable.

432.   These defendants' own records indicate that the MLS laser therapy they billed generally took only 10 minutes to perform, meaning Liberty Mutual was charged $590 a minute for this medically useless treatment.

433.   These amounts charged by the defendants for experimental and unproven services were necessarily excessive and unreasonable and the defendants cannot sustain their burden of proving otherwise.

### B.   EXCESSIVE AND UNREASONABLE DME CHARGES

434.   In addition to being unlicensed, medically unnecessary, and issued contrary to applicable standards of care, as discussed *supra*, the DME billed by Nerveana and Non Opioid Relief was charged at unreasonable rates.

435.   As discussed above, the predetermined treatment protocol used by the defendants involved billing for the issuance of DME, including lumbar back braces billed by Nerveana using HCPCS code L0637, which describes a "Lumbar-sacral orthosis, sagittal-coronal control, with rigid anterior and posterior frame/panels, posterior extends from sacrococcygeal junction to T-9 vertebra, lateral strength provided by rigid lateral frame/panels, produces intracavitary pressure to reduce load on intervertebral discs."

436.   Each time it billed Liberty Mutual for this lumbar back brace, Nerveana charged $1,500, which was at least two to four times the amount approved by CMS for DME that is properly billed utilizing HCPCS code L0637.

437.   Nerveana charged similarly excessive and unreasonable amounts for other basic DME items such as cervical pillows and heating pads.

438.   For example, each time it billed Liberty Mutual for allegedly supplying patients with a heating pad ordered by one of the defendant clinics as part of their predetermined treatment protocol, it charged $250, which was at least eight (8) to ten (10) times the retail price of the item.

439.   Nerveana and Non-Opioid Relief also charged excessive and unreasonable amounts for other types of DME as well.

440.   For example, Nerveana routinely billed $6,900 for a 30-day rental of the unnecessary cold compression devices prescribed by Accurate Care and Novamed discussed previously.  *See* Exhibit 4.

441.   The cold compression devices supplied by Nerveana, however, can be purchased for less than $350, meaning that Nerveana charged nearly twenty (20) times more for a 30-day rental than it would have cost patients to purchase their own cold compression device.

442.   Similarly, Non Opioid Relief billed Liberty Mutual $6,985 for On Lux light therapy wraps it supplied to Liberty Mutual insureds.  *See* Exhibit 5.

443.   Similar types of light therapy wraps have a retail price of less than $500, meaning that Non Opioid Relief billed Liberty Mutual an amount that was at least fourteen (14) times the retail price of the devices.

444.   Liberty Mutual is not required to pay for DME fraudulently billed pursuant to a predetermined treatment protocol or for which it was charged more than reasonable and customary rates, and is entitled to the return of all sums paid due to the fraudulent issuance and billing of DME by the defendants.

### C.   EXCESSIVE AND UNREASONABLE TRANSPORTATION CHARGES

445.   The transportation charges submitted by Transcare to Liberty Mutual were unreasonable and excessive.

446.   Transcare did not use medical or specialized vehicles, but rather just used normal vehicles to transport patients.  In other words, there was nothing unique or special or medically specific about the transportation provided by Transcare.

447.   Transcare both routinely billed Liberty Mutual separate $75 pick-up and drop off fees for every patient trip, plus approximately $4.50 per mile.

448.   These charges were grossly excessive and unreasonable, particularly considering the short distance of many of the trips billed by Transcare.

449.   For example, Transcare billed Liberty Mutual a $75 pickup fee, a $75 dropoff fee, and a mileage fee of $18.90 to transport patient J.H. (Claim No. 051208257) just four (4) miles roundtrip on March 13, 2023, which is a total charge of $168.50, or $42.22 per mile.

450.   The charges for transportation services submitted by Transcare are also unreasonable when compared to pricing from taxicab or ridesharing services for the same distance.

451.   The rate for taxi service in Detroit includes a base charge of $2.50 and a charge of $2.50 per mile, meaning the cost of the four (4) mile round trip allegedly provided to J.H., including a 15% tip, would have been approximately $17.25, far less than the $168.50 that Transcare charged.

452.   Detroit taxis also charge $20.00 per hour of waiting time, meaning that even if a taxi had transported J.H. to her appointment, waited an hour at the facility, and then transported her home, the cost still would have been only $37.25, or less than one-quarter of the amount that Transcare billed.

453.   The amounts billed by Transcare are particularly outrageous considering Transcare billed these unreasonable amounts even when it transported multiple patients in the same vehicle at the same time.

454.   For example, patients T.H. and D.R. (Claim No. 055238393) were involved in the same motor vehicle accident and allegedly received round trip transportation together from their home to Accurate Care on November 15, 2023.

455.   Transcare billed Liberty Mutual $207.15 for each patient, or $414.30 in total, including charging $4.76 per mile and $75.00 pick-up and drop off fees for

both patients despite the patients being transported together for a single 12-mile round trip.

456.   Transcare billed excessive and unreasonable rates for transportation services and it cannot sustain its burden of proving otherwise.

## XII.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY LIBERTY MUTUAL

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

457.   To induce Liberty Mutual to pay promptly their fraudulent charges, the defendants submitted to Liberty Mutual false documentation that materially misrepresented that the services and DME they referred and billed for were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment, DME, and services were lawfully and actually rendered.

458.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

459.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

460. Thus, every time the defendants submitted bills and medical records to Liberty Mutual supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

461. There are no less than 14 separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Liberty Mutual:

a. Accurate Care, Novamed, Complete Fitness, Nerveana, and Non Opioid Relief routinely billed for services that were not performed at all.

b. Accurate Care, Novamed, and Complete Fitness falsified medical records to bill for services that were not performed and to create a false appearance of injury to justify excessive and unnecessary medical treatment and billing.

c. The defendants illegally solicited patients for treatment they did not need and would not otherwise have sought but for the solicitation and engaged in *quid pro quo* relationships with each other.

d. The defendants used an improper predetermined treatment protocol, implemented by use of pre-printed, boilerplate, fabricated, and exaggerated purported examination findings, to order and bill for excessive and unnecessary diagnostic testing, physical therapy, DME, transportation, and other unnecessary treatment and services.

e. Non Opioid Relief unlawfully billed for the purported issuance of DME without possessing the licensure required by the State of Michigan.

f. Accurate Care and Novamed issued unnecessary and unsupported disability certificates to justify orders for unnecessary treatment and testing and unnecessary transportation assistance in furtherance of the

94

scheme to bill Liberty Mutual as much as possible, and not based on the individual and actual needs of patients.

g.    Accurate Care and Novamed ordered and billed for excessive and unnecessary diagnostic testing such as EMGs, NCS, and EEGs that lack medical justification in furtherance of the scheme to bill Liberty Mutual as much as possible, and not based on the individual and actual needs of patients.

h.    Accurate Care and Novamed ordered and Complete Fitness billed for unnecessary, excessive, and unreasonably long predetermined courses of physical therapy in furtherance of the scheme to bill Liberty Mutual as much as possible, and not based on the individual and actual needs of patients.

i.    Complete Fitness, Novamed, and Accurate Care billed for testing and treatment such as MLS laser therapy, TPII, and LINT that was experimental, medically unnecessary, and not compensable under the Michigan No-Fault Act.

j.    Nerveana and Novamed billed for DME that was medically unnecessary and ordered in violation of applicable standards of care in furtherance of the scheme to bill Liberty Mutual as much as possible, and not based on the individual and actual needs of patients.

k.    Transcare submitted charges to Liberty Mutual for medically unnecessary transportation before the patient had ever been evaluated by any physician or obtained any disability certificate disabling the patient from driving, and relative to patients who were not actually disabled from driving.

l.    Accurate Care billed Liberty Mutual multiple times for the same service by separately billing for individual components of a single test and that properly should have been billed as a single procedure.

m.    Accurate Care and Novamed submitted claims representing that purported patient encounters were more complex than they actually were, which is a fraudulent billing practice known as upcoding.

n.  The defendants submitted bills at rates that had no basis and were many times higher than reasonable and necessary to charge for services, if such services were rendered at all.

462.  As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

463.  If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

464.  The foregoing facts – including billing for services not rendered, falsifying medical records, illicit solicitation, using a predetermined treatment protocol to inflate charges, fraudulent billing practices, and misrepresenting the necessity of treatment and testing – were not, and could not have been, known to Liberty Mutual until it commenced its investigation of the defendants shortly before the filing of this action.

465.  The prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment, DME, and services by the defendants unnecessary and unlawful.

466.  The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 6.

467. Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Liberty Mutual by the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

468. Through the submission of patient records, invoices, HICFs, and other medical documentation to Liberty Mutual via faxes over interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, DME, and services for which they billed Liberty Mutual.

469. As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Liberty Mutual constitutes a material misrepresentation.

## B. LIBERTY MUTUAL'S JUSTIFIABLE RELIANCE

470. The documents submitted to Liberty Mutual by the defendants were designed to, and did in fact, induce Liberty Mutual to rely on the documents.

471. At all relevant times, the defendants hid from Liberty Mutual facts regarding the fact, lawfulness, and medical necessity of services and DME allegedly

provided and referred by them to prevent Liberty Mutual from discovering that the claims submitted by the defendants were not compensable under the No-Fault Act.

472. These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, DME, and services in order to seek payment under Michigan's No-Fault Act.

473. Evidence of the wrongful scheme detailed in this Complaint was not discovered until Liberty Mutual began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

474. Due to the defendants' material misrepresentations and other affirmative acts designed to hide their wrongful conduct, Liberty Mutual did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

475. In reliance on and as a result of the defendants' misrepresentations, Liberty Mutual paid money to the defendants and their associates to its detriment.

476. Liberty Mutual would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

477. As a result, Liberty Mutual has paid hundreds of thousands of dollars to the defendants and their associates as a result of their false medical documentation

and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XIII.  MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

478.   As discussed above, the referrals, treatment, DME, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

479.   The objective of the scheme to defraud Liberty Mutual, which occurred throughout the period set out in Exhibits 1 through 6, was to collect No-Fault benefits to which the defendants were not entitled because the medical services and DME rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

480.   This objective necessarily required the submission of bills for payment to Liberty Mutual.

481.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered to Liberty Mutual by the United States Postal Service or sent through faxes over interstate wires.

482.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the

insurance claims referenced throughout this pleading traveled to Liberty Mutual through interstate wires or the U.S. Mail.

483.   All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Liberty Mutual in California.

484.   Liberty Mutual received all medical records and bills faxed to it by the defendants in California.

485.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, insurance payments, and the return of cancelled checks.

486.   It was foreseeable to the defendants that faxing bills and medical records to Liberty Mutual would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Liberty Mutual.

487.   Every payment at issue in this Complaint where Liberty Mutual was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Liberty Mutual using the U.S. Mail.

488.   The insurance fraud scheme detailed herein generated hundreds of mailings and faxes.

489.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 7.

490.   As detailed herein, the defendants also submitted medical documentation and claims for payment to Liberty Mutual via fax or mail related to each exemplar patient discussed in this Complaint.

491.   It was within the ordinary course of business for Accurate Care, Novamed, Complete Fitness, Nerveana, Non Opioid Relief, and Transcare to submit claims for No-Fault payment to insurance carriers like Liberty Mutual through interstate wires and the U.S. Mail.

492.   Moreover, the business of billing for medical services and DME by each of the entity defendants at issue herein is regularly conducted by fraudulently seeking payment to which each defendant is not entitled through the use of fraudulent communications sent via intestate wires and the U.S. Mail.

493.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendants.

494.   The entity defendants, at the direction and with the knowledge of their owners and managers, including defendant Schwartz, continue to submit claims for payment to Liberty Mutual and, in some instances, continue to commence litigation against Liberty Mutual seeking to collect on unpaid claims.

495.   Thus, the defendants' commission of mail and wire fraud continues.

496.   As the defendants agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Liberty Mutual by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

497.   As the defendants agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Liberty Mutual by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

498.   Liberty Mutual reasonably relied on the submissions it received from the entity defendants, including the submissions set out in Exhibits 1 through 7 annexed hereto and identified in the exemplar claims above.

499.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Liberty Mutual's damages.

## XIV.  **DAMAGES**

500.   The wrongful conduct by the defendants injured Liberty Mutual in its business and property by reason of the aforesaid violations of law.

501.   Although it is not necessary for Liberty Mutual to calculate damages with specificity at this stage in the litigation, and Liberty Mutual's damages continue

to accrue, Liberty Mutual's injury includes, but is not limited to, compensatory damages totaling hundreds of thousands of dollars that were paid to the defendants.

502.   The payments that constitute Liberty Mutual's compensatory damages each derive from a check sent by Liberty Mutual through the U.S. Mail.

503.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Liberty Mutual rely on such documents and mail payment in response thereto.

504.   Liberty Mutual also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

505.   Liberty Mutual investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XV.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Accurate Care Enterprise)
### Against Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, Transcare Detroit Inc, and Allan Schwartz, D.O.

506.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

507.   Accurate Care constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

508.   In connection with each of the claims identified in the within Complaint, defendants Complete Fitness, Nerveana, Non Opioid Relief, Transcare, and Schwartz ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Accurate Care, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Accurate Care's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Accurate Care would occur, in furtherance of the Count I defendants' scheme to defraud.

509.   The Count I defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 7.

510.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by Accurate Care, which they knew would be billed by Accurate Care, in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

511.   Schwartz owned, managed, and controlled Accurate Care and was responsible for all actions taken by Accurate Care and its staff.

512.   Complete Fitness was responsible for providing purported physical therapy prescribed by Accurate Care that furthered and enabled Accurate Care's efforts to create the appearance of medical necessity for its services and that allowed Accurate Care to submit bills to Liberty Mutual for the medically unnecessary services and treatment described herein.

513.   Nerveana and Non Opioid Relief were responsible for purportedly supplying DME ordered by Accurate Care as part of its predetermined treatment protocol that furthered and enabled Accurate Care's efforts to create the appearance of medical necessity for its services and that allowed Accurate Care to submit bills to Liberty Mutual for its medically unnecessary services and treatment.

514.   Transcare was responsible for transporting patients to Accurate Care for unnecessary medical treatment, and for transporting patients to Complete Fitness for

physical therapy ordered by Accurate Care, which allowed Accurate Care to bill Liberty Mutual and to generate referrals to the other defendants for unnecessary medical treatment and testing.

515.   The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Accurate Care to continue billing for unlawful and medically unnecessary treatment, if provided at all.

516.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to Accurate Care for the benefit of the Count I defendants that would not otherwise have been paid.

517.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

518.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Accurate Care Enterprise)
### Against Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, Transcare Detroit Inc, and Allan Schwartz, D.O.

519.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

520.   Defendants Complete Fitness, Nerveana, Non Opioid Relief, Transcare, and Schwartz ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Accurate Care.

521.   The Count II defendants each agreed to further, facilitate, support, and operate the Accurate Care enterprise.

522.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

523.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Accurate Care even though Accurate Care was not eligible to collect such payments by virtue of its unlawful conduct.

524.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

525.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

526.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Novamed Enterprise)
### Against Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, Transcare Detroit Inc, and Allan Schwartz, D.O.

527.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

528.   Novamed constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

529.   In connection with each of the claims identified in the within Complaint, defendants Complete Fitness, Nerveana, Non Opioid Relief, Transcare, and Schwartz ("Count III defendants") intentionally caused to be prepared, faxed,

and mailed false medical documentation by Novamed, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Novamed's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Novamed would occur, in furtherance of the Count III defendants' scheme to defraud.

530.  The Count III defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 7.

531.  As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by Novamed, which they knew would be billed by Novamed, in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

532.  Schwartz owned, managed, and controlled Novamed and was responsible for all actions taken by Novamed and its staff.

533.  Complete Fitness was responsible for providing purported physical therapy prescribed by Novamed that furthered and enabled Novamed's efforts to create the appearance of medical necessity for its services and that allowed Novamed

to submit bills to Liberty Mutual for the medically unnecessary services and treatment described herein.

534.   Nerveana and Non Opioid Relief were responsible for purportedly supplying DME ordered by Novamed as part of its predetermined treatment protocol that furthered and enabled Novamed's efforts to create the appearance of medical necessity for its services and that allowed Novamed to submit bills to Liberty Mutual for its medically unnecessary services and treatment.

535.   Transcare was responsible for transporting patients to Novamed for unnecessary medical treatment, and for transporting patients to Complete Fitness for physical therapy ordered by Novamed, which allowed Novamed to bill Liberty Mutual and to generate referrals to the other defendants for unnecessary medical treatment and testing.

536.   The Count III defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Novamed to continue billing for unlawful and medically unnecessary treatment, if provided at all.

537.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to Novamed for the benefit of the Count III defendants that would not otherwise have been paid.

538.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

539.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Novamed Enterprise)
**Against Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, Transcare Detroit Inc, and Allan Schwartz, D.O.**

540.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

541.   Defendants Complete Fitness, Nerveana, Non Opioid Relief, Transcare, and Schwartz ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Novamed.

542.   The Count IV defendants each agreed to further, facilitate, support, and operate the Novamed enterprise.

543.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

544.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Novamed even though Novamed was not eligible to collect such payments by virtue of its unlawful conduct.

545.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

546.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

547.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Complete Fitness Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., Transcare Detroit Inc, and Allan Schwartz, D.O.

548.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

549.   Complete Fitness constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

550.   In connection with each of the claims identified in the within Complaint, defendants Accurate Care, Novamed, Transcare, and Schwartz ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Complete Fitness, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Complete Fitness's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Complete Fitness would occur, in furtherance of the Count V defendants' scheme to defraud.

551.   The Count V defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 7.

552.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by Complete Fitness, which they knew would be billed by Complete Fitness, in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

553.   Schwartz managed and controlled Complete Fitness and was responsible for prescribing the physical therapy billed by Complete Fitness.

554.   Accurate Care and Novamed were responsible for providing false diagnoses of injury to patients, for prescribing physical therapy for patients, and directing patients to Complete Fitness to provide the purported physical therapy and treatment that it billed to Liberty Mutual and enabled Complete Fitness's efforts to create the appearance of medical necessity for its services that allowed Complete Fitness to submit bills to Liberty Mutual for the medically unnecessary services and treatment described herein.

555.   Transcare was responsible for transporting patients to Complete Fitness for unnecessary physical therapy and treatment, which allowed Complete Fitness to bill Liberty Mutual and to generate referrals to the other defendants for unnecessary medical treatment and testing

556. The Count V defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Complete Fitness to continue billing for unlawful and medically unnecessary treatment, if provided at all.

557. As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to Complete Fitness for the benefit of the Count V defendants that would not otherwise have been paid.

558. The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

559. By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### <u>COUNT VI</u>
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Complete Fitness Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., Transcare Detroit Inc, and Allan Schwartz, D.O.

560. Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

115

561.   Defendants Accurate Care, Novamed, Transcare, and Schwartz ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Complete Fitness.

562.   The Count VI defendants each agreed to further, facilitate, support, and operate the Complete Fitness enterprise.

563.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

564.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Complete Fitness even though Complete Fitness was not eligible to collect such payments by virtue of its unlawful conduct.

565.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

566.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

567.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is

entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Nerveana Enterprise)**
**Against Accurate Care, L.L.C., Novamed L.L.C., and Allan Schwartz, D.O.**

568.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

569.   Nerveana constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

570.   In connection with each of the claims identified in the within Complaint, defendants Accurate Care, Novamed, and Schwartz ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Nerveana, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Nerveana's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Nerveana would occur, in furtherance of the Count VII defendants' scheme to defraud.

571.   The Count VII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates,

including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 7.

572. As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical equipment and services that were purportedly provided by Nerveana, which they knew would be billed by Nerveana in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

573. Accurate Care, Novamed, and Schwartz were responsible for the orders for durable medical equipment that allowed Nerveana to submit bills to Liberty Mutual for medically unnecessary medical equipment and related services.

574. Accurate Care and Novamed also billed Liberty Mutual for medically unnecessary treatment that was used to falsely create the appearance that the medical equipment and services billed by Nerveana were medically necessary.

575. The Count VII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Nerveana to bill for unlawful and medically unnecessary equipment and services.

576. As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued

payment drafts to Nerveana for the benefit of the Count VII defendants that would not otherwise have been paid.

577.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

578.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## <u>COUNT VIII</u>
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Nerveana Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., and Allan Schwartz, D.O.

579.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

580.   Defendants Accurate Care, Novamed, and Schwartz ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Nerveana.

581.   The Count VIII defendants each agreed to further, facilitate, support, and operate the Nerveana enterprise.

582.   As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

583.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Nerveana even though Nerveana was not eligible to collect such payments by virtue of its unlawful conduct.

584.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

585.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count VIII defendants' unlawful conduct described herein.

586.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Non Opioid Relief Enterprise)**
**Against Accurate Care, L.L.C., Novamed L.L.C., and Allan Schwartz, D.O.**

587.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

588.   Non Opioid Relief constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

589.   In connection with each of the claims identified in the within Complaint, defendants Accurate Care, Novamed, and Schwartz ("Count IX defendants") intentionally caused to be prepared and mailed false medical documentation by Non Opioid Relief, or knew that such false medical documentation would be mailed in the ordinary course of Non Opioid Relief's business, or should have reasonably foreseen that the mailing of such false medical documentation by Non Opioid Relief would occur, in furtherance of the Count IX defendants' scheme to defraud.

590.   The Count IX defendants knew that two (2) or more mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 7.

591.   As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical equipment and services that were

purportedly provided by Non Opioid Relief, which they knew would be billed by Non Opioid Relief in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

592. Accurate Care, Novamed, and Schwartz were responsible for the orders for durable medical equipment that allowed Non Opioid Relief to submit bills to Liberty Mutual for medically unnecessary medical equipment and services.

593. Accurate Care and Novamed also billed Liberty Mutual for medically unnecessary treatment that was used to falsely create the appearance that the medical equipment and services billed by Non Opioid Relief were medically necessary.

594. The Count IX defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Non Opioid Relief to bill for unlawful and medically unnecessary equipment and services.

595. As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to Non Opioid Relief for the benefit of the Count IX defendants that would not otherwise have been paid.

596. The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

597.   By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Non Opioid Relief Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., and Allan Schwartz, D.O.

598.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

599.   Defendants Accurate Care, Novamed, and Schwartz ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Non Opioid Relief.

600.   The Count X defendants each agreed to further, facilitate, support, and operate the Non Opioid Relief enterprise.

601.   As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

602.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Non Opioid Relief even though Non Opioid Relief was not eligible to collect such payments by virtue of its unlawful conduct.

603.   The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

604.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count X defendants' unlawful conduct described herein.

605.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Transcare Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., Complete Fitness & RHB, LLC, and Allan Schwartz, D.O.

606.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

607.   Transcare constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

608.   In connection with each of the claims identified in the within Complaint, defendants Accurate Care, Novamed, Complete Fitness, and Schwartz ("Count XI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Transcare, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Transcare's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Transcare would occur, in furtherance of the Count XI defendants' scheme to defraud.

609.   The Count XI defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 7.

610.   As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for transportation services that were purportedly provided by Transcare, which they knew would be billed by Transcare in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

611.   Accurate Care, Novamed, and Schwartz were responsible for the disability findings and orders for transportation assistance that allowed Transcare to submit bills to Liberty Mutual for medically unnecessary medical equipment and services.

612.   Accurate Care and Novamed also billed Liberty Mutual for medically unnecessary treatment that was used to falsely create the appearance that the transportation services billed by Transcare were medically necessary.

613.   Complete Fitness ordered, recommended, and billed for ongoing, excessive, and unnecessary courses of physical therapy to falsely create the appearance that the transportation services to physical therapy appointments billed by Transcare were medically necessary.

614.   The Count XI defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Transcare to bill for unlawful and medically unnecessary equipment and services.

615.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to Transcare for the benefit of the Count XI defendants that would not otherwise have been paid.

616.   The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

617.   By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Transcare Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., Complete Fitness & RHB, LLC, and Allan Schwartz, D.O.

618.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

619.   Defendants Accurate Care, Novamed, Complete Fitness, and Schwartz ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Transcare.

620.   The Count XII defendants each agreed to further, facilitate, support, and operate the Transcare enterprise.

621.   As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

622. The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Transcare even though Transcare was not eligible to collect such payments by virtue of its unlawful conduct.

623. The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

624. Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count XII defendants' unlawful conduct described herein.

625. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
## COMMON LAW FRAUD
### Against All Defendants

626. Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

627. The scheme to defraud perpetrated by Accurate Care, Novamed, Complete Fitness, Nerveana, Non Opioid Relief, Transcare, and Schwartz ("Count XIII defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

628. The misrepresentations of fact made by the Count XIII defendants include those material misrepresentations discussed in section XII.A, *supra*.

629. The Count XIII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

630. The misrepresentations were intentionally made by the Count XIII defendants in furtherance of their scheme to defraud Liberty Mutual by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Liberty Mutual.

631.   The Count XIII defendants' misrepresentations were known to be false and were made for the purpose of inducing Liberty Mutual to make payments for claims that are not compensable under Michigan law.

632.   Liberty Mutual reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

633.   As a direct and proximate result of the defendants' fraudulent representations and acts, Liberty Mutual has been damaged in its business and property as previously described herein.

## COUNT XIV
## CIVIL CONSPIRACY
### Against All Defendants

634.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

635.   Defendants Accurate Care, Novamed, Complete Fitness, Nerveana, Non Opioid Relief, Transcare, and Schwartz ("Count XIV defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Liberty Mutual by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the

defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

636. The Count XIV defendants worked together to achieve an unlawful purpose (namely, defrauding Liberty Mutual for personal gain).

637. This purpose was known to all of the Count XIV defendants and intentionally pursued.

638. Indeed, as detailed above, the Count XIV defendants engaged in inter-referrals to each other of the patients they solicited so that each could submit improper bills to Liberty Mutual.

639. The defendants also shared common ownership, control, and management, including defendant Schwartz.

640. The defendants also shared facilities, fax numbers, supplies, and equipment as part of their scheme to submit billing to Liberty Mutual.

641. Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count XIV defendants nonetheless submitted, caused to be submitted, or knew that claims would be

submitted (with accompanying false medical documentation) to Liberty Mutual seeking payment.

642.   In reasonable reliance on and as a result of the false medical documentation submitted by the defendants, Liberty Mutual paid certain of the claims submitted.

643.   All of the Count XIV defendants directly benefited from the payments made to Accurate Care, Novamed, Complete Fitness, Nerveana, Non Opioid Relief, and Transcare.

644.   All of the Count XIV defendants actively and intentionally partook in a scheme to defraud Liberty Mutual and also encouraged and aided other Count XIV defendants in the commission of acts done for the benefit of all Count XIV defendants and to the unjustified detriment of Liberty Mutual.

645.   Accordingly, all of the Count XIV defendants are equally liable for the fraud perpetrated on Liberty Mutual pursuant to their conspiracy.

<u>**COUNT XV**</u>
**PAYMENT UNDER MISTAKE OF FACT**
**Against Accurate Care, L.L.C., Novamed L.L.C., Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, and Transcare Detroit Inc**

646.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

647.   Liberty Mutual paid the amounts described herein under a misunderstanding, misapprehension, error, fault, or ignorance of material facts,

namely, the scheme to defraud Liberty Mutual by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Accurate Care, Novamed, Complete Fitness, Nerveana, Non Opioid Relief, and Transcare ("Count XV defendants").

648.   Liberty Mutual sustained damages by paying under a mistake of fact the claims submitted by the Count XV defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services and DME allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

649.   The Count XV defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Liberty Mutual under a mistake of fact.

650.   Liberty Mutual is entitled to restitution from each of the Count IX defendants, individually and jointly, for all monies paid to and/or received by them from Liberty Mutual.

651.   The Count XV defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XVI
## UNJUST ENRICHMENT
### Against All Defendants

652. Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

653. Defendants Accurate Care, Novamed, Complete Fitness, Nerveana, Non Opioid Relief, Transcare, and Schwartz ("Count XVI defendants") submitted, caused to be submitted, or benefited from claims submitted to Liberty Mutual that caused Liberty Mutual to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

654. Liberty Mutual's payments constitute a benefit which the Count XVI defendants aggressively sought and voluntarily accepted.

655. The Count XVI defendants wrongfully obtained or benefited from payments from Liberty Mutual through the wrongful conduct detailed herein.

656. The Count XVI defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XVII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

657. Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 505 set forth above as if fully set forth herein.

658.   Defendants Accurate Care, Novamed, Complete Fitness, Nerveana, Non Opioid Relief, Transcare, and Schwartz ("Count XVII defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

659.   The Count XVII defendants also billed for services not rendered.

660.   The Count XVII defendants also billed for services pursuant to wrongful conduct whereby patients were subjected to a predetermined treatment protocol for the purpose of generating claims to Liberty Mutual, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

661.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.   Mich. Comp. Laws §§ 500.3105 and 500.3107.

662.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.   Mich. Comp. Laws § 500.3107.

663.   The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.   Mich. Comp. Laws §§ 500.3157(1).

664. Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

665. The Count XVII defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Liberty Mutual, and other claims remain pending with Liberty Mutual.

666. The Count XVII defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Liberty Mutual has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XVII defendants for any or all of the reasons set out in the within Complaint.

667. Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVII defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

668. Liberty Mutual also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVII defendants were engaged in a wrongful scheme whereby they billed for unnecessary and unlawful

treatment and submitted unreasonable charges for the same to Liberty Mutual at all relevant times.

669.   As such, the Count XVII defendants have no standing to submit, pursue, or receive benefits or any other payment from Liberty Mutual, and Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVII defendants cannot seek payment from Liberty Mutual for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint.

670.   Liberty Mutual further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVII defendants cannot balance bill or otherwise seek payment from any person insured under an Liberty Mutual policy or for whom Liberty Mutual is the responsible payor related to the wrongful conduct detailed in the within Complaint.

## XVI.  <u>DEMAND FOR RELIEF</u>

WHEREFORE, plaintiffs Liberty Mutual Personal Insurance Company, LM General Insurance Company, American Economy Insurance Company, and Safeco Insurance Company of Illinois respectfully pray that judgment enter in their favor as follows:

## COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Accurate Care Enterprise)
### Against Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, Transcare Detroit Inc, and Allan Schwartz, D.O.

(a) AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b) AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c) GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Accurate Care Enterprise)
### Against Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, Transcare Detroit Inc, and Allan Schwartz, D.O.

(a) AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b) AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c) GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
**(Novamed Enterprise)**
**Against Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, Transcare Detroit Inc, and Allan Schwartz, D.O.**

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
**(Novamed Enterprise)**
**Against Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, Transcare Detroit Inc, and Allan Schwartz, D.O.**

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Complete Fitness Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., Transcare Detroit Inc, and Allan Schwartz, D.O.

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Complete Fitness Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., Transcare Detroit Inc, and Allan Schwartz, D.O.

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Nerveana Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., and Allan Schwartz, D.O.

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Nerveana Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., and Allan Schwartz, D.O.

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Non Opioid Relief Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., and Allan Schwartz, D.O.

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Non Opioid Relief Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., and Allan Schwartz, D.O.

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Transcare Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., Complete Fitness & RHB, LLC, and Allan Schwartz, D.O.

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Transcare Enterprise)
### Against Accurate Care, L.L.C., Novamed L.L.C., Complete Fitness & RHB, LLC, and Allan Schwartz, D.O.

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT XIII
### COMMON LAW FRAUD
**Against All Defendants**

(a)     AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

### COUNT XIV
### CIVIL CONSPIRACY
**Against All Defendants**

(a)     AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

### COUNT XV
### PAYMENT UNDER MISTAKE OF FACT
**Against Accurate Care, L.L.C., Novamed L.L.C., Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, and Transcare Detroit Inc**

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XVI
## UNJUST ENRICHMENT
### Against All Defendants

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XVII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)     DECLARE that Liberty Mutual has no obligation to pay pending and previously-denied insurance claims submitted by Accurate Care, L.L.C., Novamed L.L.C., Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, Transcare Detroit Inc, and Allan Schwartz, D.O., jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Accurate Care, L.L.C., Novamed L.L.C., Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, Transcare Detroit Inc, and Allan Schwartz, D.O., jointly and severally, cannot seek payment from Liberty Mutual pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint;

(c)     DECLARE that Accurate Care, L.L.C., Novamed L.L.C., Complete Fitness & RHB, LLC, Nerveana, LLC, Non Opioid Relief LLC, Transcare Detroit Inc, and Allan Schwartz, D.O., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Liberty Mutual policy or for whom Liberty Mutual is the responsible payor related to the wrongful conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVII. DEMAND FOR JURY TRIAL

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted,

KTM

*/s/ Andrew H. DeNinno*

_____

Andrew H. DeNinno (P87678)
adeninno@ktmpc.com
Brad A. Compston
bcompston@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated: October 28, 2024          *Attorneys for Plaintiffs*

146